**Kevin E. WILLI, Plaintiff and Appellant,**

v.

**Sharon D. WILLI, Defendant and Appellee.**

Civ. No. 10358.

Supreme Court of North Dakota.

June 24, 1983.

Farhart, Rasmuson, Lian & Maxson, Minot, for plaintiff and appellant; argued by Judith E. Howard, Minot.

McGee, Hankla, Backes & Wheeler, Minot, for defendant and appellee; argued by Russel G. Robinson, Minot.

SAND, Justice.

Kevin Willi (Kevin) appealed from a judgment which, among other things, granted him and the defendant, Sharon Willi (Sharon), an absolute divorce, gave custody of their two children, Tricia and Erica, to Sharon and gave Kevin reasonable

visitation rights, including custody of Tricia and Erica for a period of one month per year during any month selected by Kevin by giving a month's notice. Kevin's visitation was on the condition that he furnish a bond in the amount of $5,000.00 in favor of Sharon to guarantee the return of the children after visitation. The judgment also required Kevin to deposit with the Ward County clerk of court the sum of $150.00 per month for child support for each child (Erica and Tricia), to pay Sharon actual attorney's fees in the amount of $2,666.75. On appeal, Kevin contested the custody award of Tricia but not of Erica, the posting of the $5,000.00 bond, and the payment of attorney's fees.

The marriage of Kevin and Sharon on 3 February 1978 at Tucson, Arizona, had its problems from the beginning. Kevin and Sharon had two children, Tricia, born 5 August 1978, and Erica, born 11 February 1980, during their marriage. Prior to this marriage Sharon had had another daughter out of wedlock, Shannon. Kevin was in the Air Force at Minot, North Dakota, as an E–4 Sergeant for four years but has completed his service[1] and is now living in Michigan.

The primary issue raised on appeal is whether or not the trial court erred in awarding custody of Tricia to Sharon. Kevin essentially contended before the trial court and on appeal that Sharon herself was an abused child and that, as a result, Sharon became and was an abusive parent toward Tricia. On appeal, Kevin did not contest the custody award of Erica to Sharon; however, because of Sharon's alleged abusive conduct toward Tricia, he contended that the trial court erred in awarding Sharon custody of Tricia.

In resolving the custody issue, the best interest and welfare of the child is the overriding and determining factor. *Lapp v. Lapp,* 293 N.W.2d 121 (N.D.1980); NDCC § 14–09–06.1. The fitness of the parent generally is not the paramount concern in a child custody matter, but it cannot be ig-

nored and becomes a matter of genuine interest whenever the fitness of a parent has a direct bearing on the best interest of the child. *See, Larson v. Larson,* 294 N.W.2d 616 (N.D.1980); *Gross v. Gross,* 287 N.W.2d 457 (N.D.1979); *Odegard v. Odegard,* 259 N.W.2d 484 (N.D.1977).

North Dakota Century Code § 14–09–06.2 sets forth factors to be considered by the court in determining the best interests and welfare of a child and provides as follows:

"For the purpose of custody, the best interests and welfare of the child shall be determined by the court's consideration and evaluation of all factors affecting the best interests and welfare of the child. These factors include all of the following when applicable:

1.  The love, affection, and other emotional ties existing between the parents and child.

2.  The capacity and disposition of the parents to give the child love, affection, and guidance and to continue the education of the child.

3.  The disposition of the parents to provide the child with food, clothing, medical care, or other remedial care recognized and permitted under the laws of this state in lieu of medical care, and other material needs.

4.  The length of time the child has lived in a stable, satisfactory environment and the desirability of maintaining continuity.

5.  The permanence, as a family unit, of the existing or proposed custodial home.

6.  The moral fitness of the parents.

7.  The mental and physical health of the parents.

8.  The home, school, and community record of the child.

9.  The reasonable preference of the child, if the court deems the child to be of sufficient intelligence, under-

---

1. Kevin denied being a resident of North Dakota but lived in North Dakota for four years.

See NDCC § 14–03–01.1 re jurisdiction. No party has challenged jurisdiction.

standing, and experience to express a preference.

10. Any other factors considered by the court to be relevant to a particular child custody dispute.

"In any proceeding under this chapter, the court, at any stage of the proceedings after final judgment, may make orders about what security is to be given for the care, custody, and support of the unmarried minor children of the marriage as from the circumstances of the parties and the nature of the case is equitable."

Kevin testified and produced evidence supporting his contention that Sharon was not a suitable parent for Tricia because she was abusive to Tricia and that, therefore, he should have custody of Tricia. In rebuttal, Sharon denied the accusation regarding her parenting and testified that she was a good parent to Tricia.

As to the findings of fact by the trial court, Rule 52(a), NDRCivP, applies. The trial court's memorandum opinion,[2] in part, stated that:

"The Court is called upon to decide a serious issue from the testimony of two parties, neither of whom it finds to be totally credible. We have convenient lapses of memory on the defendant's (Sharon) part; the plaintiff (Kevin) on the other hand has supernatural recall. The defendant is absolutely ignorant of a grave occurrence that could hardly be forgotten by anyone of the defendant's intelligence; the plaintiff recalls perfectly occurrences that never transpired."

This clearly discloses that the trial court attached no credibility to the "diametrically opposed testimony" of the parties. This, in part, may have prompted the quasi ex parte proceedings[3] conducted by the court in taking the testimony of Timothy Frazier, a witness from Denver and an acquaintance of Sharon, after the close of the trial, and the letter of inquiry the trial judge made to the police department in Tucson, Arizona, relating to an alleged incident that occurred prior to the marriage of Kevin and Sharon.

The trial court found, in its memorandum opinion, that "love, affection, and other emotional ties exist between both parents and their children," and that "both parties have the capacity and disposition to give the children love, affection, and guidance and to continue the education of the children."

The trial court also found that:

"The moral fitness of the parents by today's standards seems acceptable, however again the father's character is flawed when one considers that his checking account was closed because of numerous N.S.F. checks; he took one of the children away without notice to the other

**2.** The only findings made by the court were contained in its memorandum opinion dated 11 May 1982, which concluded with the following:

"The attorney for the defendant shall prepare the Findings of Fact, Conclusions of Law, and Order for Judgment."

This was not accomplished and no explanation was given, nevertheless, on 21 December 1982 the court issued its order for judgment containing the following:

"... and the Court having made its Memorandum Decision, dated May 11, 1982, in which the Court's Findings of Fact and Conclusions of Law appear and the Court having filed the same pursuant to Rule 52(a) of the North Dakota Rules of Civil Procedure ...."

**3.** Attorney Peterson, for Sharon, stated:

"I feel a duty to my client. The Court requested that we not call our clients. I have not, of course, done so. I have complied and I'm sure Mrs. Howard has also; however, for the record I feel my client does have a right to be present at all stages of the proceeding and I object to the testimony since I have not consulted her and don't feel I can adequately represent her interest without her presence.

"THE COURT: The testimony will be transcribed and you will be given ample opportunity to take exception to it, Mr. Peterson; as will you, Miss Howard."

From this we may infer that the court instructed the attorneys not to notify their clients. The court also observed that it would entail quite a bit of travel for one party to come back to Minot from Denver. However, there is a difference in advising the parties that their presence is not mandatory or is optional rather than not informing the parties at all about the matter as was the situation here, which borders on a lack of due process and should be avoided. Furthermore, we believe the trial court placed undue consideration upon the Tucson incident, which occurred before their marriage, as having a bearing on the issue under consideration.

parent, irrespective of his pretended honorable reasons; he failed to support his children and wife; this causes the Court to feel that the defendant [Sharon] has the tip in her favor of the scales on this score."

On 2 March 1981 Sharon left Minot with the three girls and went to Denver. Kevin testified that he did not know where Sharon went, but he thought she went to her parents' home in Denver, which he later verified by calling them. The record does not disclose if Kevin gave his consent to Sharon to take the three girls with her to Denver, nor was a court order or legal document authorizing Sharon to take the children to Denver referred to or produced. We must, therefore, assume that Sharon did not take the children to Denver pursuant to or in accordance with a court order.[4]

In May of 1981 Kevin went to Denver and saw Sharon and brought Tricia back to Minot with him. On 13 July 1981 Kevin served a divorce summons and complaint upon Sharon.[5] On 28 July 1981 Kevin obtained a temporary custody order for custody of Tricia. The trial began the latter part of May 1982.

The trial court found as a fact that Kevin took Tricia from Denver to Minot without informing Sharon and has retained custody every since. However, no finding or consideration was given to the authority Sharon had to take the children from Minot to Denver. Furthermore, Kevin obtained an interim order granting him custody of Tricia subsequent to bringing her back from Denver.

The memorandum opinion also noted that Kevin's character was flawed because he wrote numerous NSF checks and failed to support his children and wife. However, in this respect the credit union [Minot Air Force Base] records disclose that either Kevin or Sharon could write checks on the account and that Sharon depleted the account to $10.00 in about seven days during the last days of February and on 2 March 1981. The amount withdrawn was $1,356.96. This may account for the reason why Kevin did not make any child support or spousal support payments.

The court placed considerable importance on an investigation conducted by the Colorado Health Department which was instigated by Kevin because he misinterpreted medical bills. The court noted that the report concluded that the interaction between the mother and daughters (Erica and Shannon) was healthy and that there was no reason to believe that Sharon was abusive or neglectful. Significantly, however, Tricia was not present during this period of time and, consequently, it had little or no bearing on Kevin's main contention that Sharon verbally abused Tricia.

Although the trial court noted that "most of the emphasis in the hearing was placed on the relationship of Sharon vis-a-vis Tricia" the trial court did not make any findings relative to that relationship and the interaction between Tricia and Sharon. The trial court made general findings and conclusions concerning the relationships between both Kevin and Sharon and the two children, Erica and Tricia; however, no specific findings of fact on the disputed testi-

**4.** This presents an interesting question: What justification was there for Sharon to take the children from Minot to Denver? Under this posture, was Kevin estopped from bringing back a child or the children to Minot? Did the taking of the children from Minot to Denver constitute their uprooting? If not, did bringing Tricia back to Minot constitute an uprooting? A further unanswered question: Under this situation, was Kevin required to send support payments for the children, or did Sharon assume that responsibility by doing what she did? If Sharon took the children to Denver without Kevin's permission, is Kevin prevented from bringing the children, or a child, back to Minot without Sharon's permission? More specifically, can Kevin be faulted for his action or this situation? These are all interesting questions which were not specifically addressed by the trial court and need not be specifically answered in the disposition of the issues on appeal before this Court.

**5.** However, the judge commented that Sharon would have initiated divorce proceedings in Denver, Colorado. This has no real bearing except as it may apply to attorney's fees.

mony regarding the relationship between Sharon and Tricia were made.

If we take a cue from the trial court's memorandum opinion that neither Sharon nor Kevin were credible, we then have very little relevant testimony pertaining to the interaction between Sharon and Tricia, or how Tricia was treated by her mother, particularly in the area of whether or not Sharon verbally abused Tricia.

Lynn Schuster (Lynn), the babysitter, babysat Tricia before Sharon took the children to Denver and after Kevin brought Tricia back. Lynn testified that before Tricia was taken to Denver she did not seem to want to have anything to do with the other children and Sharon raised her voice at Tricia and called her unpleasant names, and slapped her on her leg so that Tricia became hysterical; that Tricia was an inward child —introverted; that she stayed mostly apart from other children; that she did not want to be cuddled; and that if she was picked up she became very rigid, like a block of wood and would scream until she was put down again. Lynn testified that Sharon treated Erica much better than she treated Tricia, and that Tricia would run and meet Kevin, who would pick her up and show his affection for her by kissing her.

Lynn testified that within a week after her return Tricia started to talk to and play with the other children much more, and she did not mind being picked up. She noticed a very general improvement. Before, when Tricia wanted to climb on her mother's lap, she was pushed away. During the period after Tricia's return from Denver, Lynn noticed that the interaction between Kevin and Tricia was that of a normal, happy father and daughter, and she was clean, her hair was brushed, and her clothes were clean and fresh every day.

Pursuant to court order and after the court rendered its decision, William J. Hampstead, a psychologist from Michigan, made an evaluation of Tricia to establish a base line for comparison if she was evaluated in the future, and gave his report dated 22 October 1982. He found her to be average in the five general skills. She was reluctant to discuss family matters. She had a mild distrust of authority figures and feelings of intimidation by them. The report concluded with a recommendation that Tricia should be provided the opportunity to interact with her mother on a reasonable and regular basis and that the interaction should only be limited if Tricia began to display behavioral or emotional deterioration as a result of her contact with her mother. However, in this respect, the testimony of the babysitter cannot be disregarded. Additionally, the evaluation was ordered by the court after having decided to give custody of Tricia to Sharon and was designed to provide a gauge for future reference, and, as a result, has little value in our review of the decision of the trial court.

Anthony Citrin, an assistant professor of education at Minot State College with several degrees, including a doctorate of education, and who also had taught classes on early childhood education, human development, and child abuse and detection, sat in the courtroom and heard Kevin's side of the testimony. He was asked to consider the testimony and express his opinion. In his opinion, he thought there was an easy interaction between Kevin and Tricia, that Sharon did not have the capacity and disposition to provide love, guidance and affection, medical care and adequate food to Tricia, but that Kevin could provide Tricia with a stable environment. He also stated that Sharon had emotional problems with respect to Tricia, and that the reaction or interaction between Sharon and Tricia was typical of a verbal abuse situation.

After a careful review of the record we conclude that the trial court did not make appropriate findings of fact regarding matters upon which the best interests of the child are founded which would be relevant to the primary issue here, *i.e.,* the interaction between Sharon and Tricia and how it relates to the custody of Tricia. Furthermore, we believe the trial court erroneously relied upon the "character flaws" of Kevin. We further conclude that the trial court erred in awarding custody of Tricia to Sharon.

On the matter of attorney's fees which Sharon incurred and which the trial court directed Kevin to pay, the record contains affidavits setting out the total amount of the statutory costs, attorney's fees and costs. Attached to the affidavit is a billing setting out dates of telephone conferences, letters, dates of attending conferences and motions in court, but no time allocation is given for each, nor is a specific sum allowed for each in the billing. The itemization merely contains a total of $2,666.75 for attorney's fees. While we have high regard for the need of the trial judge to determine reasonable fees, an itemization such as we have here leaves much to speculation.[6] Neither did the trial court give any reason for requiring Kevin to pay attorney's fees for Tricia. In this respect, we note that the court observed that Sharon would have brought the divorce action if Kevin had not. After taking into consideration the total property involved and earning ability, we believe a more equitable solution regarding the attorney's fees would be achieved if Kevin and Sharon were to share on a 50–50 basis regarding the attorney's fees incurred by Sharon.

Accordingly, we direct that the judgment be modified to give custody of Tricia to Kevin with reasonable visitation rights for Sharon, and that Kevin be required to pay child support to the clerk of court for Erica only in the amount of $150 per month, and that the $5,000 penal bond requirement to guarantee the return of the children after visitation be eliminated from the judgment. We further direct that the judgment be modified to provide that Kevin be required to pay only $1,384.38 (fifty percent of the $2,768.75) attorney's fees incurred by Sharon.

The judgment as modified is affirmed with neither party receiving costs on appeal.

ERICKSTAD, C.J., and VANDE WALLE, PEDERSON and PAULSON, JJ., concur.

---

6. As to reasonable attorney's fees, and the standards and other factors to be taken into consideration, see *D.M. v. W.J.S.*, 315 N.W.2d 683 (N.D.1982); *City of Bismarck v. Thom*, 261 N.W.2d 640 (N.D.1977); *Hughes v. North Dakota Crime Victims Reparations Board*, 246 N.W.2d 774 (N.D.1976); and *Baer v. O'Keefe*, 235 N.W.2d 885 (N.D.1975). See also, *Schollmeyer v. Saxowsky*, 211 N.W.2d 377 (N.D. 1973); and *Municipal Airport Authority of the City of Fargo v. Stockman*, 198 N.W.2d 212 (N.D.1972), stating that the trial court is an expert on the value of legal services.