Lynnette F. LAPP, Plaintiff and Appellant,

v.

Dale E. LAPP, Defendant and Appellee.

Civ. No. 9735.

Supreme Court of North Dakota.

May 15, 1980.

Wheeler, Wolf, Wefald, Peterson & Mc-Donald, Bismarck, for plaintiff and appellant; argued by Robert O. Wefald, Bismarck.

Kapsner & Kapsner, Bismarck, for defendant and appellee; argued by Carol Ronning Kapsner, Bismarck.

ERICKSTAD, Chief Justice.

The plaintiff appeals from a judgment of divorce entered in Burleigh County District Court, South Central Judicial District, on November 5, 1979. We remand the judgment for modification and affirm as modified.

The plaintiff, Lynnette F. Lapp (Lynette), and the defendant, Dale E. Lapp (Dale), were married in Bismarck, North Dakota, on November 27, 1971. One child was born of the marriage, namely, Trina M. Lapp, on April 1, 1973.

Lynnette and Dale lived together in their mobile home in Bismarck until early January of 1979 when Lynnette separated from her husband and moved into an apartment. She commenced an action for legal separation by service of a summons and complaint upon Dale on January 10, 1979, and, in conjunction therewith, moved for, and was granted, an interim ex parte order giving her temporary custody, care, and control of Trina. Dale answered the complaint by denying the pertinent allegations, and by his counterclaim, the action was converted to one of divorce on the grounds of irreconcilable differences. Dale requested a hearing on the interim order which was conducted on January 22, 1979. The district court thereafter ordered, in pertinent part, that temporary custody of the minor child remain with Lynnette, and that Dale be allowed to visit the child "at least one day each week."

Trial was held in Burleigh County District Court in early October of 1979. A memorandum opinion was issued by the district court on October 11, 1979, and the findings of fact, conclusions of law, and

order for judgment were executed on November 2, 1979. The district court found that both Lynnette and Dale were fit, willing, and able parents, and in its conclusions of law, the court made the following relevant determinations as to custody of the parties' minor child and the division of the marital estate:

"IV.

"The plaintiff will be awarded the 1975 Blazer vehicle and will be required to assume the indebtedness thereon.

"V.

"The mobile home of the parties will be sold and the proceeds used to pay any indebtedness against the mobile home, with the balance of the equity therein to be divided equally between the parties.

"VI.

"The defendant shall receive, free and clear of any claim of the plaintiff, the partially finished house of the parties in Grande Prairie Estates and the land in Mercer County that he received from his father. In exchange therefor, the defendant is to pay all of the bills of the parties, except for the outstanding indebtedness on the 1975 Blazer.

"VII.

"Custody of the minor child of the parties, namely, Trina M. Lapp, born on the 1st day of April, 1973, will be divided equally between the parties. The plaintiff shall have custody of the child for a period of six (6) months each year, beginning with the 1st day of August, 1979. Commencing with the 1st day of February, 1980, the defendant will be awarded custody of the child for a period of six (6) months. Thereafter, the custody will alternate in the same manner. Each non-custodial parent will be awarded one (1) weekend visitation per month, and the party requesting visitation will give at least seventy-two (72) hours notice of the visitation requested and will be responsible for picking up . . . the child not earlier than 10:00 a. m. on Saturday . . to be returned not later than 8:15 p. m. on Sunday. In the event a parent's or grandparent's birthday occurs in a non-custodial period, the non-custodial parent shall be entitled to custody of the child during said birthday between the hours of 10:00 a. m. and 8:15 p. m. The defendant will also be entitled to custody of the child between the hours of 10:00 a. m. and 8:15 p. m. on July 4th and December 25th every other year, commencing with December 25, 1979. The plaintiff will be entitled to custody of the minor child between 10:00 a. m. and 8:15 p. m. on the child's birthday every other year, commencing in 1979."

Judgment was entered on November 5, 1979.

On December 26, 1979, Lynnette filed a notice of appeal, and later applied to the district court for an order to stay the judgment pending appeal. The district court granted the stay of execution on January 25, 1980, and ordered that the stay would terminate concurrently with the expiration of the current school year.

On appeal, Lynnette has raised two issues, namely:

(1) Whether or not the district court's award of child custody, which provided for split or alternating custody of the minor child between the parties on a six-month rotating basis, was clearly erroneous under Rule 52(a) of the North Dakota Rules of Civil Procedure; and

(2) Whether or not the division of real property was clearly erroneous?

Lynnette also asked this court to stay the judgment of the district court until such time as a decision is rendered on appeal.

■■■ The law concerning our scope of review in divorce actions is well-settled. A trial court's determinations on matters of child custody, child support, alimony, and the division of property are treated as findings of fact. *Bosma v. Bosma*, 287 N.W.2d 447 (N.D.1980); *Hegge v. Hegge*, 236

N.W.2d 910 (N.D.1975). The findings of the trial court will not be set aside on appeal unless they are clearly erroneous. Rule 52(a), N.D.R.Civ.P. As this court recently said in *Nastrom v. Nastrom*, 284 N.W.2d 576, 580 (N.D.1979):

"A particular finding of fact is clearly erroneous when, although there is some evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been made. *Bender v. Bender*, 276 N.W.2d 695 (N.D.1979); *Bohnenkamp v. Bohnenkamp*, 253 N.W.2d 439 (N.D.1977); *In re Estate of Elmer*, 210 N.W.2d 815 (N.D.1973).

"Our scope of review is thus limited by the clearly erroneous rule, and rightly so, for a judge present in the courtroom is in a much better position to ascertain the true facts by listening to and observing the demeanor of the witnesses than we are by reading the cold record."

Although the district court's determinations in the present case as to custody and the division of property are labeled conclusions of law, labels placed upon such matters by the trial court are not conclusive. *Rummel v. Rummel*, 265 N.W.2d 230 (N.D.1978). Whether or not a particular finding is a finding of fact or a conclusion of law is to be determined by the reviewing court. *Bosma v. Bosma*, 287 N.W.2d at 451.

With these considerations in mind, we shall review the district court's relevant findings to determine whether or not they are clearly erroneous.

## CHILD CUSTODY

This court has repeatedly held that the best interests and welfare of the child must dictate custody in a divorce action. *Bohnenkamp v. Bohnenkamp*, 253 N.W.2d 439 (N.D.1977); *Kottsick v. Carlson*, 241 N.W.2d 842 (N.D.1976); *DeForest v. DeForest*, 228 N.W.2d 919 (N.D.1975); *Ferguson v. Ferguson*, 202 N.W.2d 760 (N.D.1972); *see* Sections 14–09–06.1 and 14–09–06.2, N.D.C.C.

1. The terms "split custody", "alternating custody", or "joint custody" will be used interchangeably throughout this opinion, and refer

Lynnette contends that the trial court failed to take the best interests of the child into consideration when it ordered that custody be split between the parties on a six-month alternating basis.[1] She asserts that this contention is supported by the trial court's failure to mention Section 14–09–06.2, N.D.C.C., and the factors enumerated therein, in its memorandum opinion.

Section 14–09–06.2, N.D.C.C., was enacted by our Legislature in 1979, and provides as follows:

"14–09–06.2. *Best interests and welfare of child—Court consideration—Factors.* For the purpose of custody, the best interests and welfare of the child shall be determined by the court's consideration and evaluation of all factors affecting the best interests and welfare of the child. These factors include all of the following when applicable:

1. The love, affection, and other emotional ties existing between the parents and child.

2. The capacity and disposition of the parents to give the child love, affection, and guidance and to continue the education of the child.

3. The disposition of the parents to provide the child with food, clothing, medical care, or other remedial care recognized and permitted under the laws of this state in lieu of medical care, and other material needs.

4. The length of time the child has lived in a stable, satisfactory environment and the desirability of maintaining continuity.

5. The permanence, as a family unit, of the existing or proposed custodial home.

6. The moral fitness of the parents.

7. The mental and physical health of the parents.

8. The home, school, and community record of the child.

to arrangements in which each parent retains custody of the child for a specified period of time.

9. The reasonable preference of the child, if the court deems the child to be of sufficient intelligence, understanding, and experience to express a preference.

10. Any other factors considered by the court to be relevant to a particular child custody dispute.

"In any proceeding under this chapter, the court, at any stage of the proceedings after final judgment, may make orders about what security is to be given for the care, custody, and support of the unmarried minor children of the marriage as from the circumstances of the parties and the nature of the case is equitable."

This statutory provision is merely a codification of those factors which have always been relevant for consideration by a trial court when determining custody in a divorce dispute. Section 14–09–06.2 is not a significant departure from the existing case law which has evolved throughout the past decade in this state. *See Muraskin v. Muraskin*, 283 N.W.2d 140 (N.D.1979); *Vetter v. Vetter*, 267 N.W.2d 790 (N.D.1978). A close examination of the record reveals that the factors enumerated in Section 14–09–06.2, N.D.C.C., were properly considered by the trial court.

A brief review of the relationship of the parties in the instant case may be helpful to better understand the situation confronting the trial court. The record shows that Lynnette is twenty-five years old, is in good physical and mental health, has a twelfth-grade education, and is presently employed full-time as a commission sales person of major appliances at Montgomery Ward in Bismarck. Her average monthly salary is approximately $1,000 and she works a forty-hour work week. Lynnette resides in an apartment with her seven-year-old daughter, Trina, whom she has temporary custody of pursuant to the district court's interim order.

Prior to their separation in January of 1979, the parents of either Lynnette or Dale babysat extensively for Trina while Lynnette and Dale were working. Both sets of grandparents reside in Bismarck, and the record clearly discloses that all have had very close contact with Trina since her birth. Either Lynnette's parents Oscar and Betty Lapp,[2] or Dale's parents, Emil and Alma Lapp, have taken care of and babysat for Trina nearly every day for the past seven years. Both Lynnette and Dale have relied upon their parents for this service which has been faithfully rendered over the years.

Lynnette presented two expert witnesses at trial relative to her fitness as a custodial parent. The two expert witnesses—Jerry Feist and Bryan Smith—had received their master's degree in social work and had been employed by the Social and Rehabilitation Services Center in Bismarck at the time of their professional contact with Lynnette. Both men were primarily involved in the field of marital and family counseling.

Jerry Feist testified that Lynnette was referred to the Center by her attorney in January of 1979. Feist conducted six counseling sessions with Lynnette over a span of approximately two months. Trina, as well as Lynnette's parents, were present and participated in several of the rehabilitative sessions. Feist also testified that he met separately with Dale on one occasion after Dale had made repeated attempts to visit with a social worker.

Feist's testimony disclosed that Lynnette had been fearful and uncertain about the divorce process shortly after the separation, but that her disposition had improved considerably as a result of counseling. Feist testified he observed during joint sessions, where Trina was present, that Lynnette's primary concern always seemed to be Trina's welfare. His opinion was that Lynnette was a "very capable, responsible, competent mother." Although Feist was unable to furnish a professional opinion as to which parent was the preferred custodial parent, due to his limited contact with Dale, he expressed the belief that Lynnette would be a capable and qualified custodial parent.

2. Lynnette's maiden name, as well as her married name, was Lapp.

In addition to Jerry Feist, Lynnette presented the testimony of Bryan Smith. Smith had taken over Lynnette's file after Feist left the Social and Rehabilitative Services Center in February of 1979. Smith conducted ten counseling sessions with Lynette commencing February 28, 1979, and ending in August of that year. Trina was also present during several of these sessions and participated in play-therapy interaction with her mother.

Smith's testimony as to Lynnette's disposition and fitness as a parent was generally in accord with the testimony of Feist. Smith was of the opinion that Trina was a happy and well-adjusted child, and that Lynnette would be the preferable custodial parent. Cross-examination revealed, however, that Smith had never met nor spoken to Dale and, therefore, was unable to form an opinion as to Dale's capabilities and qualifications as a parent.

The record further discloses that Dale is thirty-three years of age, is in excellent health, has an eighth-grade education, and is a self-employed contractor. His gross monthly income is approximately $620, and he has been unemployed for periods of time due primarily to the seasonal nature of his work. Dale currently resides in the parties' mobile home located in Bismarck.

The district court's interim order of January 23, 1979, provided that Dale "shall be allowed to visit with the child [Trina] at least one day each week, but not on Wednesdays or Sundays unless the plaintiff consents to visitation on said days." Dale testified that he has been able to regularly see his daughter only on Saturdays. Lynnette has apparently strictly construed the "at least one day each week" provision to mean only one day a week. Dale testified that Lynnette has refused to extend visitation privileges to him even on special occasions when he has made early requests and arrangements to see Trina.

Specifically, Dale referred during the trial to one instance where his relatives had planned a large family reunion. Dale had known about the festivities six months in advance and had his attorney prepare a written request for extended visitation rights on that special occasion. The written request was sent to Lynnette approximately six weeks prior to the family reunion but she nevertheless refused to allow Dale to keep the child beyond the one day referred to in the district court's order. Dale also testified that he had requested additional visitation with Trina on his birthday, but this request was also denied.

A study of the record reveals that Trina was very close to Dale's parents prior to the separation in January, 1979. Trina is the only grandchild of Emil and Alma Lapp, Dale's parents, and their testimony indicates the existence of a close relationship. Alma Lapp testified that she babysat for Trina approximately three or four days a week prior to the separation. Since the issuance of the court order which restricted Dale's visitation rights, his parents, as well as the other members of his family, have seen very little of Trina. The record shows that Dale has made it a practice to celebrate family occasions on Saturdays, the only day he or his immediate family has any significant contact with Trina. All members of Dale's family expressed a desire to see more of Trina.

In regard to Dale's fitness as a custodial parent, the testimony of Bonnie Schwab, a personal friend of both Dale and Lynnette, was presented at the trial. Schwab had been in close contact with both parents and their minor child over the past seven years and had observed their capabilities as parents. She testified that Dale would be able to "provide a more stable, disciplined, organized home." She explained that it wasn't a question of who loved Trina more, but rather, that Dale was a more stable influence and could better provide for Trina's needs.

In addition to Bonnie Schwab, Dale also presented as an expert witness, Carol Nitschke, a probation officer for the Burleigh County Juvenile Court. Nitschke had been ordered by the district court, pursuant to section 14–09–06.3, N.D.C.C., to conduct an investigation and make a recommendation concerning custodial arrangements for the parties' minor child.

Nitschke conducted interviews not only with Dale and Lynnette, but also with both sets of grandparents, friends, employers, social workers, and other acquaintances. Although inexperienced in the field, Nitschke testified that both Lynnette and Dale were acceptable parents. She, however, expressed a preference for Dale and concluded that he would be the better custodial parent.

Lynnette's principal contention with reference to Section 14–09–06.2, N.D.C.C., centers around factors four and five as enumerated therein. She maintains that these two factors, which refer to the desirability of maintaining continuity in the child's environment, and the permanence of the existing or proposed custodial arrangement, reveal a skepticism regarding split or alternating custody. She contends that if these factors are properly considered, split or alternating custody will rarely, if ever, be granted. We disagree.

■■■ We have recognized that it is not in the best interests of a child to unnecessarily change custody and bandy the child back and forth between the parents. *Silseth v. Levang*, 214 N.W.2d 361 (N.D.1974). However, we have also determined that split or alternating custody is not *per se* erroneous. *DeForest v. DeForest*, 228 N.W.2d 919 (N.D.1975). When the evidence adduced at trial supports a finding that a split or alternating custody award is in the best interests of the child, then such a finding will not be found clearly erroneous on appeal. *Id.* at 925. Whether or not a split custody arrangement is appropriate depends on the facts and circumstances of the particular case.

■■■ We are convinced, after examining the entire record, that each of the applicable factors set forth in Section 14–09–06.2, N.D.C.C., was properly addressed during the trial and considered by the court in determining the custody award. We do not believe, nor does the statute require, that the trial court must make an express written finding as to each of the factors enumerated. If a careful perusal of the record discloses that evidence was presented relative to each of the applicable factors, that is sufficient to satisfy the requirements of Section 14–09–06.2.

■ The district court's memorandum opinion reveals the consideration given to the above-mentioned factors. We believe there is substantial evidence in the record supportive of the district court's finding that both Lynnette and Dale were fit, willing, and able parents. The district court determined that the facts and circumstances warranted a split custody award on a six-month alternating basis, with one weekend visitation per month granted to the noncustodial parent. In addition, the noncustodial parent was awarded visitation rights on birthdays of said parent or respective grandparents. We believe there is substantial evidence in the record supportive of a split custody arrangement, and from the record we extract the following important considerations:

(1) Both parties expressed a strong desire to retain custody of the minor child, and both suggested that the child should be afforded liberal visitation with the noncustodial parent and with the respective grandparents, all of whom reside in Bismarck.

(2) Both parties demonstrated that they are capable of raising the child in a stable and satisfactory environment, and of providing for her physical and emotional needs.

(3) The expert witnesses who testified at trial on Lynnette's behalf were of the opinion that Lynnette was a capable and qualified custodial parent. However, neither witness was qualified to form an opinion as to which parent was the preferred custodial parent because neither witness had sufficient professional involvement with Dale.

(4) The expert witness who had been ordered by the district court to conduct a custody investigation testified that both Lynnette and Dale were "suitable custodial parents." However, her recommendation to the court was that Dale was the "better custodial parent."

(5) The work hours and routine of both parents are such that child care will be suitable at both homes.

(6) The logistics are such that there will be no substantial disruption of the child's routine, schooling, etc. Both parents are of close geographical proximity, *i. e.*, both reside and work in Bismarck.

(7) Both maternal and parental grandparents reside in Bismarck, have spent a considerable amount of time with the child over the past seven years, and are apparently willing and able to continue to do so. Either Lynnette or Dale's parents have babysat for Trina nearly every day over the course of their marriage. The grandparents have provided Trina with food, clothing, love, affection, guidance, and care while her parents were working.

(8) Since the parties separated in January of 1979, Lynnette has had temporary custody of Trina pursuant to the district court's interim order. The interim order provided that Dale was entitled to visitation privileges "at least one day each week." The record reveals that Lynnette strictly construed this provision and has not allowed visitation beyond the strict letter of the order. Dale, and the other members of his family, have been limited to short visits with Trina on Saturdays only. Repeated requests for extended visitation on special occasions have been denied. Lynnette has been inflexible and uncooperative in allowing Dale and his parents to see Trina during the interim period.

These factors, taken together, are supportive of the district court's decision to award custody to the parties on a split or alternating basis. The trial court had the parties and numerous witnesses before it, and it had the grave and difficult responsibility of determining the best interests of the child. The trial court is better able than we are to discover the true facts as it is able to listen to and observe the demeanor of the witnesses, whereas we are bound by the cold record on appeal. "The mere fact that the appellate court might have viewed the facts differently, if it had been the initial trier of the case, does not entitle it to reverse the lower court." *Bosma v. Bosma*, 287 N.W.2d 447, 451 (N.D.1980).

Had this court been the initial trier of the case, the outcome may have been different. A viable alternative might have been to have awarded sole custody to one of the parents while affording the noncustodial parent liberal and extensive visitation rights. Another possible choice under the circumstances might have been a division of custody in such a manner that one parent retained custody during the school months and the other parent retained custody for a substantial part of the summer vacation. *See Gasser v. Gasser*, 291 N.W.2d 272 (N.D. 1980). Another possible solution might have been to place the child with one parent for one school year and with the other parent for the next school year with a similar variation in custody for the summer vacations. Nevertheless, our scope of review is limited by the clearly erroneous rule, and we believe the evidence adduced at trial supports the district court's decision to award split custody to the parties under the circumstances of this case on a six-month alternating basis.

 We recognize that the trial court's findings in this case could have been more specific and explicit as to the factors considered in the custody decision. Facts are to be found specially to enable the appellate court to correctly understand the factual issues determined by the trial court. Rule 52(a), N.D.R.Civ.P.; *DeForest v. DeForest*, 228 N.W.2d 919 (N.D.1975). We are also cognizant of the fact that the trial court did not expressly state that the split custody arrangement was "in the best interests of the child." However, we do not believe the failure to so state warrants the setting aside of the relevant findings and a remand of the case for further proceedings. *See Gross v. Gross*, 287 N.W.2d 457 (N.D. 1979). A study of the entire record reveals that the trial court made the following expression in its stay order dated January 25, 1980:

> "The reality is that in some cases joint custody is the least detrimental of the alternatives available. Custody in the present case is split . . .. I consider

this to be the least detrimental alternative." [3]

Although this statement was made subsequent to the entry of judgment, it is indicative of the trial court's consideration and belief that a split or alternating custody arrangement was in the best interests of the child. We are not left with a firm and definite conviction that a mistake has been made.

Over the past few years, we have become aware of a mounting clamor for changes in the laws pertaining to child custody. The discussion about the complexities of custody and visitation in our changing society has spurred the publication of a number of books, articles, and treatises throughout the country.[4] We have commented on the theories contained in one such book, namely, *Beyond the Best Interests of the Child,* by Goldstein, Freud, and Solnit (The Free Press, 1973). *See Gardebring v. Rizzo,* 269 N.W.2d 104 (N.D.1978); *DeForest v. DeForest,* 228 N.W.2d 919 (N.D.1975); *Jordana v. Corley,* 220 N.W.2d 515 (N.D.1974).

Our research has revealed that there is no general agreement among courts, lawyers, psychologists, behavioral scientists, social workers, or other professionals in the family law field as to the wisdom and desirability of joint custody arrangements. An annotation in 92 A.L.R.2d 695 (1963) entitled "Split, Divided, or Alternate Custody of Children," points out the conflicting views:

"[W]hile the best interests of the child should be the paramount consideration, the court also has considered the desires of the parent who does not have primary custody where such parent is fit to have custody.

"Where a child is to spend most of the time with one parent, it is nevertheless desirable that the child have the love, interest, and training which the other can give, and where such other parent exhibits a proper interest in and attitude toward the child, he or she should have the custody of it for a reasonable period of time. On the other hand, it is said that it is difficult, if not impossible, for a child to live a normal, happy life where there is a division of the custody and control of the child.

"A frequent shifting of a child from home to home exposes it to changes of discipline and habits, and may invite lax discipline and disobedience. Stability in the human factors affecting a child's emotional life and development is essential, and it may be argued that this stability can best be attained with such an undivided custody as will prevent the child from being shunted back and forth between homes." Annot., 92 A.L.R.2d at 698–99.

While there are certain disadvantages to split or alternating custody awards, there are also important advantages and benefits to this Solomonic [5] arrangement which are readily apparent. Children need interaction and interrelationship with their parents, siblings, and other persons who may significantly affect the child's best interests. Nevertheless, we must not lose sight of the paramount consideration in ·custody decisions—the best interests of the child.

There are no winners in child custody battles, nor are there any painless solutions. Divorced parents must recognize that the disturbing situation was brought about by them. They must try to cooperate, deal with the vagaries of post-divorce life, and attempt to make the custody arrangement

---

**3.** The phrase "the least detrimental alternative" was referred to by this court in *DeForest v. DeForest,* 228 N.W.2d 919 (N.D.1975). We stated at footnote 1 that the exact words "best interest of the child" need not necessarily be used in the findings. The phrase was borrowed from the authors of *Beyond the Best Interests of the Child* who suggested that the more appropriate guideline in custody determinations is "what available alternative is the least detrimental to the child."

**4.** For an excellent discussion of, and reference to, recent books, articles, cases, treatises, and law review articles pertaining to child custody, particularly joint custody, *see* Foster and Freed, "Joint Custody—A Viable Alternative?", *Trial* magazine (May 1979) at 27–31, 64–65; *see also* Annot., 92 A.L.R.2d 695 (1963 and later case service).

**5.** *See* 1 *Kings* 3:16–28.

work in order to safeguard their child's, not to mention their own, physical, mental, emotional, and psychological well-being. All due consideration must be given to the child's developmental needs. Once the child of a divorce becomes the focus of conflict between parents, many irrational negative attitudes will begin to find expression and the ultimate loser will surely include the innocent child. Divorced parents and the respective grandparents should always exercise extreme caution to avoid poisoning the mind of the child toward the other parent or grandparent, particularly in cases of joint or split custody.

The courts are unable to compel the development of healthy parent-child relationships. Nor are courts able to supervise the ongoing day-to-day happenings between parent and child. Specific conditions imposed concerning custody arrangements and visitation rights can only be justified and made workable through the combined efforts of the parents. We sincerely hope the parties in the present case recognize the importance of cooperation, and we encourage them to set aside their differences and work to provide a healthful environment for their minor child. In any possible future hearing involving custody, one's failure to permit reasonable visitation could be a very significant factor in the court's ultimate disposition of the issue.

## DIVISION OF PROPERTY

The second issue on appeal concerns the district court's award to Dale of 160 acres of land in Mercer County. Lynnette contends that she is entitled to receive one-half the value of the equity in this tract of land. We disagree.

The record shows that sometime after the parties were married, Dale's parents, Emil and Alma Lapp, transferred as a gift, 160 acres of land to Dale. The testimony at trial reveals that it was the mutual understanding of all parties involved that the purpose of the transfer was to provide Dale

with collateral in order to purchase a lot and finance the construction of a new home in Grand Prairie Estates, Bismarck. Dale testified that it was understood that his parents would pay the taxes on the property, the land would be farmed by his brother, Emil Lapp, Jr., and his parents would derive the income from the land (one-half of the crop share). The remaining one-half share of the crop went to Emil Lapp, Jr., as the tenant. The testimony of Dale's father and brother confirmed the existence of such an arrangement.[6]

Dale's parents have continued to pay taxes on the land; his brother is still farming the land; and his parents are dependent upon the income derived from the 160 acres for their livelihood and support. Neither Dale nor Lynnette have ever derived any benefit from the tract of land other than its use as collateral. The land in question is presently encumbered by a mortgage in the amount of $12,000 to secure a loan from the Bank of Beulah. Payments on the mortgage are delinquent, and Dale testified that he currently owes approximately $15,000 to the bank on the note and mortgage.

No evidence was presented as to the fair market value of the 160-acre tract of land, nor did Lynnette dispute the purpose of the transfer of land to Dale, the arrangements for farming the land, and the use of the income attributed to the land. Her sole contention is that this tract of land ought to be sold and the remaining equity divided equally between the parties. This is the only asset of the marital estate with which Lynnette has taken issue. No showing has been made that the distribution of the marital estate, when viewed in its entirety, is inequitable.

Section 14–05–24, N.D.C.C., requires the trial court to make an equitable distribution of the real and personal property of the parties to a divorce action. There are no fixed and rigid rules by which the trial court is to divide the marital estate. The determination of what is an equitable

6. No objection was made to the introduction of this testimony on the ground that such evidence was violative of the parol evidence rule.

See Sections 9–06–07 and 9–07–04, N.D.C.C.; *Gajewski v. Bratcher*, 221 N.W.2d 614 (N.D. 1974).

distribution lies within the discretion of the trial court and depends upon the facts and circumstances of each case. *Nastrom v. Nastrom*, 284 N.W.2d 576 (N.D.1979). This court has repeatedly held that there is no requirement that a property division be equal in order to be equitable. *Hoge v. Hoge*, 281 N.W.2d 557 (N.D.1979); *Rudel v. Rudel*, 279 N.W.2d 651 (N.D.1979); *Bender v. Bender*, 276 N.W.2d 695 (N.D.1979); *Mattis v. Mattis*, 274 N.W.2d 201 (N.D.1979).

We believe that the award of 160 acres to Dale is fair, equitable, and warranted under the circumstances. An equitable distribution of the real property is not synonymous with an equal division of each particular asset of the marital estate. Although Dale was awarded the 160-acre tract of land in Mercer County (value unknown), and the parties' partially-constructed home in Grande Prairie Estates, he was also ordered to pay all of the parties' outstanding bills except for the indebtedness remaining on the 1975 Blazer vehicle awarded to Lynnette. In addition to the indebtedness of approximately $15,000 on the 160-acre tract of land, and the $29,000 approximately owed on a construction loan which is secured by a mortgage on the land upon which the house is situated and which is currently in the process of being foreclosed upon, the record reveals that the parties have incurred a considerable amount of personal indebtedness over the course of the marriage.

There is sufficient evidence in the record to support the trial court's determination on the matter of the division of property. The distribution of the real property under the circumstances is just, proper, and equitable. We are not left with a firm and definite conviction that a mistake has been made.

### STAY ORDER

By order of the district court dated January 25, 1980, judgment was stayed pending appeal. The court further ordered that the stay would terminate concurrently with the expiration of the school year. Lynnette has asked this court to continue the stay order pending the issuance of a decision on appeal.

We believe it is in the best interests of the child to continue the stay order until the expiration of the current school year. As there are only a few weeks remaining in the school term, a removal of Trina from her present custodial environment could, under the circumstances, be very disruptive and should be avoided at this juncture in time. In so concluding, we recognize that Lynnette retains the custody over Trina during a part of the custodial period afforded to Dale by the judgment (February 1— July 31). The provision of the district court's interim order which gave temporary custody to Lynnette and provided that Dale be allowed to visit the child "at least one day each week" does not mean that Dale is limited to a mere one day of visitation per week, as Lynnette seems to believe. Because we are continuing the custody of Trina in Lynnette until the close of the school year, we will expect Lynnette to afford Dale liberal visitation privileges, especially during that period of time. Because Lynnette will have had custody of Trina not only for the six months during which she was awarded custody (August 1 to January 31), but also for most of the six months during which Dale was awarded custody (February 1 to July 31), the judgment is modified so that Dale shall have custody of Trina from the day following the close of the school term this summer until January 1, 1981. Thereafter, Trina's custody shall alternate at six-month intervals between the parties on a January 1 through June 30 and July 1 through December 31 basis, with custody in Lynnette commencing on January 1, 1981. The judgment is further modified because of the foregoing modifications to provide that Dale shall be entitled to custody of Trina between 10:00 a. m. and 8:15 p. m. on Trina's birthday every other year, commencing in 1981. The judgment in all other respects is affirmed. So that the judgment may be appropriately modified, this case is remanded.

VANDE WALLE, PEDERSON, PAULSON and SAND, JJ., concur.