**Suzanne ROEN, Plaintiff, Appellee and Cross–Appellant,**

v.

**William G. ROEN, Defendant, Appellant and Cross–Appellee.**

**Civ. No. 880168.**

Supreme Court of North Dakota.

March 27, 1989.

Lundberg, Nodland, Schulz, Lervick & Tharaldson, Bismarck, for plaintiff, appellee and cross-appellant; argued by Ardell Tharaldson.

Pearson, Christensen & Fischer, Grand Forks, for defendant, appellant and cross-appellee; argued by Garry A. Pearson.

Evans & Moench, Ltd., Bismarck, for defendant, appellant and cross-appellee; argued by Dale W. Moench.

MESCHKE, Justice.

Dr. William Roen appealed from a divorce decree awarding custody of the chil-

dren, spousal support, and property to Suzanne Roen. We affirm. Suzanne sought attorney's fees for the appeal. We remand for determination of attorney's fees by the trial court.

When they were married in 1971 at Seattle, Bill was an aeronautical engineer and Suzanne was an overseas flight attendant for an airline. After a short stay on a ranch with Bill's father, they moved to Grand Forks in 1972 where Bill gained his medical education and internship. In 1977, Bill became a medical resident at Mayo Clinic, Rochester, Minnesota. In 1981, he began a medical practice in Seattle, and, in 1984, they moved to Bismarck, where Bill has practiced medicine in a clinic.

Suzanne, who has a degree in sociology, worked as a flight attendant until 1980. Then, for a short time, she worked part-time as a travel agent and as a restaurant hostess. Suzanne became a full-time homemaker soon after their first child was born in 1980.

## PROPERTY DIVISION

The trial court divided 219 marital assets and debts. Over 200 were personal items or household goods. Many of these were difficult to value because they were antiques or from foreign countries.

On appeal, there was no dispute about the equal division of major items, including the proceeds from the house, Bill's interest in his clinic corporation, his clinic building partnership, his pension plan and IRA account, their three cars, their checking accounts, their life insurance, and Suzanne's stock. Nor was there any dispute about the distribution of many items that both or neither wanted; Suzanne divided them into two groups and Bill chose one of the groups.

However, as to 26 items distributed to Bill and 124 items distributed to Suzanne, the trial court sought to give each spouse the property each wanted in nearly equal values. To do so, the trial court reasoned:

"Valuation placed on the remaining items not already disposed of in this opinion reveal considerable disparity in valuation. There is a pattern to this disparity.

The party who expects to receive an assets [sic] has put a low value on it, and the party who does not expect to receive it has put a high value on it.

\* \* \* \* \* \*

"Interestingly, Mrs. Roen says that the items she is getting are worth $31,500, and the items he is getting are worth $67,800, or about $36,300 more than she. Dr. Roen, on the other hand, says he is getting $52,000 in property, but that she is getting $82,000, or about $30,000 more. Given this, one is tempted to conclude that the division of property as set forth herein is essentially equal, but it is apparent that Mrs. Roen has frequently missed the mark badly on matters of valuation, for example, the house, jewelry, and Waterford glass. Human nature being what it is, I assume there is some inflating and discounting of the figures used by Dr. Roen, and if we inflate the value he says he is getting by 20 percent and deflate the value he says she is getting by 20 percent, and use the values as adjusted, an equality of values of the assets each is receiving results, being between $62,000 and $66,000."

Challenging these calculations as arbitrary, Bill suggested, as a remedy, that this disputed property also be divided into two groups by one spouse with the other spouse allowed to select one group.

Bill argued that his valuations were accurate and should have been used by the trial court. He supported his credibility by pointing out that he placed a higher value than Suzanne on some items he received and that his valuation of other property was supported by independent testimony.

Although they did not match her estimates, Suzanne argued that the trial court's values were not clearly erroneous. She dismissed Bill's figures as only his opinion, not those of a professional appraiser.

"Generally, if evidence in the record supports the trial court's property division, it is not clearly erroneous and we do not disturb the division." *Behm v. Behm*, 427 N.W.2d 332, 337 (N.D.1988). There were

no independent appraisals. Thus, the trial court's valuations were a reasonable reaction to the disparity in the parties' skimpy and self-serving evidence on values. We must give "due regard ... to the opportunity of the trial court to judge the credibility of the witnesses." NDRCivP 52(a). The values set by the trial court were within the range of the evidence and, accordingly, were not clearly erroneous. Therefore, we affirm the property distribution.

## SPOUSAL SUPPORT

The trial court decreed that Bill pay Suzanne spousal support of $2,000 per month for two years. Thereafter, Bill was ordered to pay $1,000 per month, plus ten percent of his gross income over $100,000 during "the preceding calendar year." Bill challenged this, claiming that Suzanne is "an excellent candidate for rehabilitation," that "she has an education and is capable of earning a substantial income," and that, as the trial court found, she was not being "'dumped,' ... after having materially aided her husband in completing his medical education." Bill also complained that the trial court did not require that spousal support cease in the event of Suzanne's death, remarriage or cohabitation.

Preferably, spousal support is to rehabilitate a disadvantaged spouse. However, it may be required indefinitely to maintain a spouse who cannot be adequately restored to independent economic status. *Rustand v. Rustand*, 379 N.W.2d 806, 807 (N.D.1986); *Briese v. Briese*, 325 N.W.2d 245 (N.D.1982). Here, the trial court found that Suzanne had "foregone a significant number of wage earning years and, as a consequence, can never obtain future earnings as high as they would be had she been working continuously, nor is it likely that she can achieve the same level of retirement benefits." We agree with the trial court that it was "appropriate to recognize [this] permanent economic loss by making an allowance for permanent spousal support." We have held that a lack of adequate retirement savings can be an equitable consideration in awarding support

to a disadvantaged spouse. *Wheeler v. Wheeler*, 419 N.W.2d 923 (N.D.1988).

Furthermore, as Suzanne argued, the trial court was free to consider her former standard of living along with her comparative ability for self support. We have said that a "disparity in the earning abilities of the parties justifies the award" of spousal support. *Weir v. Weir*, 374 N.W.2d 858, 864 (N.D.1985). Continuance of a standard of living can enter into the equation. *Bagan v. Bagan*, 382 N.W.2d 645, 646 (N.D. 1986). "The determinative factor is the sufficiency of income to permit each party to maintain apart the standard of living enjoyed together." *Id.* While Bill complained that his income, "subject to taxes and obligations, is not sufficient to permit each party to maintain [apart] ... the standard of living enjoyed together," the trial court found that his "gross income has been steadily increasing and in 1987 was over $100,000."

Suzanne had no immediate separate income and received little income-producing property in the property division. Since she had not been employed outside of the home for a number of years, Suzanne was in no position to continue her accustomed standard of living. While current debts and taxes may reduce Bill's gross income substantially, before support payments, we conclude that the trial court had sufficient evidence to award permanent spousal support to Suzanne equaling twelve percent of Bill's annual income, after her two-year rehabilitation. In view of Bill's sizeable income, Suzanne's lesser earning capacity, and her economic disadvantages accumulated during their marriage, the award of spousal support was not clearly erroneous.

More bothersome is the trial court's failure to set an end for spousal support if Suzanne dies or remarries. The trial court is authorized "to make such suitable allowances to the other party for support during life or for a shorter period as to the court may seem just." NDCC 14-05-24. Our experience evidences that uncertainty about the effect of major events on spousal support dooms divorced persons to meet again in the courtroom. We have a parade

of examples: *Clement v. Clement*, 325 N.W.2d 262 (N.D.1982); *Bauer v. Bauer*, 356 N.W.2d 897 (N.D.1984); *Bullock v. Bullock*, 376 N.W.2d 30 (N.D.1985); and *Rustand v. Rustand*, 379 N.W.2d 806 (N.D.1986). As these decisions illustrate, unlimited spousal support can be a courtroom trip for the unwary. A trial court will act to terminate unlimited spousal support upon death or remarriage of the supported spouse unless there are extraordinary circumstances which justify its continuance. *See Rustand v. Rustand, supra,* and its predecessors. Therefore, it is preferable for a trial court to spell out preordained contingency limits of spousal support in the divorce decree.

■ But, this record does not bear out that Bill asked the trial court to set contingency limits on Suzanne's support. We are unwilling to modify a lower court judgment for a deficiency first identified during the appeal. The trial court "from time to time may modify its orders" for spousal support. NDCC 14–05–24. We recently declared that this retained power to modify spousal support was a sufficient limitation when a term was not fixed in the divorce decree. *Behm v. Behm, supra,* at 335. That applies here.

## CUSTODY

Bill and Suzanne have two sons: Graham, born in 1980, and Carson, born in 1983. The trial court ascertained that both Bill and Suzanne were fit parents. The trial court placed custody of the children with Suzanne, reasoning that they "have been progressing satisfactorily while in the mother's primary care, and no compelling reason exists to alter the arrangement, particularly when, in all probability, she will be able to spend more time with them than would he, even when she resumes outside employment."

On appeal, Bill argued that there was a "paucity of the findings" by the trial court on factors relevant to child custody. Bill asserted that the trial court should have recognized the boys' desire to live with him, since Suzanne planned to move to another state. Bill claimed greater stability for the boys staying in the same community, with "virtually their only remembered home, schools, friends and church," rather than moving "to a distant location." Finally, he submitted several published articles by experts who opined that children of divorce do better living with the same-sex parent (boys with their father) than with the opposite-sex parent.

Suzanne responded that since she had been principally responsible for the boys' care, custody with her was most appropriate. She pointed out that two child psychiatrists, who had interviewed the boys and had testified for Bill, did not recommend which parent should have their custody. She also pointed out that opinion evidence about same-sex custody had not been presented to the trial court.

Choosing between divorced parents, both fit and loving, for custody of their children is not easy. "Neither the trial court nor this court has the wisdom of Solomon." *Landsberger v. Landsberger,* 364 N.W.2d 918, 920 (N.D.1985). The guiding standard is "the best interests and welfare of the child." NDCC 14–09–06.1. A trial court must consider and evaluate "all factors affecting the best interests and welfare of the child" enumerated in NDCC 14–09–06.-2.[1] *Gravning v. Gravning,* 389 N.W.2d 621 (N.D.1986).

---

1. Part of NDCC 14–09–06.2 says:

    *"Best interests and welfare of child—Court consideration—Factors.* For the purpose of custody, the best interests and welfare of the child shall be determined by the court's consideration and evaluation of all factors affecting the best interests and welfare of the child. These factors include all of the following when applicable:

    "1. The love, affection, and other emotional ties existing between the parents and child.

    "2. The capacity and disposition of the parents to give the child love, affection, and guidance and to continue the education of the child.

    "3. The disposition of the parents to provide the child with food, clothing, medical care, or other remedial care recognized and permitted under the laws of this state in lieu of medical care, and other material needs.

    "4. The length of time the child has lived in a stable, satisfactory environment and the desirability of maintaining continuity.

A child's preference is only one factor, "if the [trial] court deems the child to be of sufficient intelligence, understanding, and experience to express a preference." NDCC 14–09–06.2(9); *Bergstrom v. Bergstrom*, 296 N.W.2d 490, 496–97 (N.D.1980). While community stability is a consideration, it is not overriding. It can be outweighed by factors favoring a residence elsewhere. *See Hedstrom v. Berg*, 421 N.W.2d 488 (N.D.1988). Continuity in a child's relationship with the closest, nurturing parent is also a very important aspect of stability.[2] *Orke v. Olson*, 411 N.W.2d 97, 100–01 (N.D.1987).

■ Although the trial court did not make separate findings on each relevant statutory factor, it did consider all of them: "In reviewing the factors set forth in § 14–09–06.2, N.D.C.C., one must conclude that the evidence here does not overwhelmingly favor either parent." Finding that Suzanne would probably resume employment, the trial court determined that, since the boys would be in school, "it is apparent that the children will be in the daily care of others, regardless of which parent has custody." The trial court had satisfactory reasons for its placement of custody when it determined that the boys had been "progressing satisfactorily" in their mother's "primary care" and that she would "spend more time with them than would" their father. The trial court specifically determined that Suzanne's "reasons for leaving the state are reasonable and in the best interests of the children."

In *Branson v. Branson*, 411 N.W.2d 395, 396 (N.D.1987), we recently summarized principles for reviewing a placement of custody:

> "5. The permanence, as a family unit, of the existing or proposed custodial home.
> "6. The moral fitness of the parents.
> "7. The mental and physical health of the parents.
> "8. The home, school, and community record of the child.
> "9. The reasonable preference of the child, if the court deems the child to be of sufficient intelligence, understanding, and experience to express a preference.
> "10. Any other factors considered by the court to be relevant to a particular child custody dispute."

"A trial court's determinations on child custody, ... are treated as findings of fact, which will not be set aside on appeal unless they are clearly erroneous. [Citation omitted]. Findings of fact are presumptively correct. [Citation omitted]. The complaining party bears the burden of demonstrating that findings are erroneous, and a finding is clearly erroneous only when the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made."

We are satisfied that the trial court fairly weighed closely balanced evidence and determined custody on appropriate factors in concluding that the best interests of these children were with Suzanne.

## ATTORNEY'S FEES

■ Suzanne sought an award of attorney's fees for this appeal, pointing out that she received no income producing assets and that she has no full time employment. The trial court and this court have concurrent jurisdiction to award attorney's fees on appeal. NDCC 14–05–23. We prefer that the trial court determine the amount of attorney's fees for a spouse on a divorce appeal. *McIntee v. McIntee*, 413 N.W.2d 366 (N.D.1987); *Pitsenbarger v. Pitsenbarger*, 382 N.W.2d 662, 666 (N.D.1986). Therefore, we remand to the trial court for determination of Suzanne's attorney's fees on this appeal.

VANDE WALLE, J., and VERNON R. PEDERSON, Surrogate Justice, concur.

2. We have not made primary caretaker status a paramount or presumptive factor in custody disputes. *See Gravning v. Gravning*, 389 N.W.2d 621, 622 (N.D.1986). But the importance of a child's primary caretaker can certainly be considered by the trial court in its assessment of the best interests of that child. *Id.* For discussion of the primary caretaker preference, *see* Marcia O'Kelly, *Blessing the Tie that Binds: Preferring the Primary Caretaker as Custodian*, 63 N.D.L.Rev., no. 4, 482 (1987).

LEVINE, Acting C.J., and JOHN O. GARAAS, Surrogate Justice, concur in the result.

VERNON R. PEDERSON, Surrogate Justice and JOHN O. GARAAS, Surrogate Justice, sitting in place of ERICKSTAD, C.J., and GIERKE, J., disqualified.