**Chris KALOUPEK, Plaintiff and Appellant,**

**v.**

**Michael BURFENING, Defendant and Appellee.**

**Michael BURFENING, Plaintiff and Appellee,**

**v.**

**Christine L. KALOUPEK, Defendant and Appellant,**

**and**

**Bank of North Dakota, Defendant.**

Civ. Nos. 880191, 880192.

Supreme Court of North Dakota.

May 17, 1989.

Arline F. Schubert (argued), Grand Forks, for defendant and appellant.

Caldis, Arneson & Tingum, Ltd., Gordon Caldis, argued, Grand Forks, for plaintiff and appellee.

GIERKE, Justice.

Chris Kaloupek appeals from a district court judgment awarding to Chris and the defendant, Michael Burfening, joint physical custody of their son, Robert, on a six month alternating basis. We affirm.

Chris and Michael began a relationship in 1981, but they were never married. Chris is a widow who has two daughters born of her marriage in 1972 and 1975. Michael was previously married and divorced but has no children from his marriage. Chris and Michael purchased a home in Grand Forks in 1983 and lived there with Chris' daughters until Michael moved out in June 1987.

Robert was born on March 24, 1986, and was two years old at the time of the custody proceedings in the trial court. Both Chris and Michael sought physical custody of Robert. The trial court concluded that it would be in Robert's best interests for Chris and Michael to share his legal and physical custody. The court awarded joint physical custody to Chris and Michael, alternating every six months until Robert starts school, at which time, the court declared, it would redetermine custodial arrangements upon motion of the parties.

On appeal Chris asserts that the trial court's custody determination is clearly erroneous. Chris argues that the trial court should have awarded physical custody of Robert to her, because she has been Robert's primary caretaker and because a six month separation from his mother and stepsisters would not be in Robert's best interests.

A trial court's determinations on matters of child custody are treated as findings of fact which will not be set aside on appeal unless they are clearly erroneous. *Lapp v. Lapp*, 293 N.W.2d 121 (N.D.1980). A finding of fact is clearly erroneous if the reviewing court is left with a definite and firm conviction that a mistake has been made. *Bender v. Bender*, 276 N.W.2d 695 (N.D.1979).

Although we have recognized that it is not in the best interests of a child to unnecessarily change custody or to bandy the child back and forth between parents, [*Silseth v. Levang*, 214 N.W.2d 361 (N.D. 1974) ], we have also concluded that split or alternating custody is not per se erroneous. *DeForest v. DeForest*, 228 N.W.2d 919 (N.D.1975). In North Dakota parents have equal rights to the custody and control of their minor children, and as between a mother and father there is no presumption as to who will better promote the best interests and welfare of the child. *Gravning v. Gravning*, 389 N.W.2d 621 (N.D. 1986). When the evidence supports a trial

court's finding that a split or alternating custody award is in the best interests of the child, that finding will not be found clearly erroneous on appeal. *Lapp, supra.*

The trial court has provided us with a well written memorandum decision, including the following analysis and findings of fact pertinent to its alternating joint custody award:

> "Both Chris and Mike are loving parents to Robert and both wish to have custody of him. Both play an important role in his life. Robert also has a close relationship with grandparents and other extended family in the Grand Forks area.
>
> \* \* \* \* \* \*
>
> "Chris feels that Grand Forks is not 'big enough' for both she and Mike. She wants to go back to the Boston area, but has no employment there and she has lived in North Dakota all of her adult life. Her Social Security income is sufficient to provide her with most of her needs. She feels that there should be no overnight visitation between Mike and Robert. In effect, Chris does not seek to truly maintain and foster the parent-child relationship between Mike and Robert. This is contrary to the best interests of Robert and the Court finds that it is necessary to assure an adequate opportunity for the parent-child relationship between Mike and Robert to survive and grow.
>
> "So far as the factors contained in Section 14–09–06.2 of the North Dakota Century Code are concerned, it would appear that both parties love Robert and Robert loves both of his parents.
>
> "Both Chris and Mike have the capacity and disposition to give Robert the necessary love, affection and guidance that he needs.
>
> "Both Chris and Mike have equal disposition to provide Robert with the necessities of life.
>
> "It is important to maintain the continuity of Robert's home in the Grand Forks area. Both parents live in Grand Forks at the present time, along with the paternal grandparents and other extended family of both Chris and Mike. Chris'

in-laws live in Grand Forks and Virginia Kaloupek is very supportive of Chris and her grandchildren. As a matter of fact, both parents are fit custodians.

> \* \* \* \* \* \*
>
> "In order to give Robert the benefit of both parent's contribution to his upbringing, it would be in the best interests of the child to share legal and physical custody between Mike and Chris. The parties shall alternate physical custody every six (6) months until Robert starts school, at which time the Court will redetermine custodial arrangements upon motion of the parties."

■ Having carefully reviewed the record in this case, we are convinced that the trial court's custody determination is not clearly erroneous. There is substantial evidence to support the trial court's determination that both parents have the ability and desire to care for Robert's needs and that Robert would benefit from both parents sharing in his upbringing.

One important factor underlying the trial court's decision was that Chris did not manifest a desire to foster the father-son relationship between Michael and Robert. Chris requested the court to give her physical custody with very limited visitation for Michael and specifically requested that Michael receive no overnight visitations at least until Robert had completed the first year of school. The trial court concluded that its alternating joint custody award would foster, in Robert's best interests, both Chris and Michael's parent-child relationship with Robert.

■ Chris asserts that the trial court gave inadequate consideration to factors four and five under Section 14–09–06.2, N.D.C.C.:

> "*14–09–06.2. Best interests and welfare of child—Court consideration—Factors.* For the purpose of custody, the best interests and welfare of the child shall be determined by the court's consideration and evaluation of all factors affecting the best interests and welfare of the child. These factors in-

clude all of the following when applicable:

\*　　\*　　\*　　\*　　\*　　\*

"4. The length of time the child has lived in a stable, satisfactory environment and the desirability of maintaining continuity.

"5. The permanence, as a family unit, of the existing or proposed custodial home."

We disagree with Chris' contention that the trial court did not adequately address the foregoing custody considerations. The trial court found that both parents have played an important role in Robert's life and that it is important to maintain the continuity of Robert's home in the Grand Forks area where he has both parents as well as extended family. The trial court determined that it could best maintain stability and continuity in Robert's life by allowing each parent to open his and her home to Robert, alternately sharing in the responsibility of providing the day to day care, love, and nurture that physical custody entails. Also, the trial court provided liberal visitation for each parent during that parent's non-custodial time period, thereby encouraging substantial and continual involvement by both parents in Robert's daily life. We are convinced that the trial court's determinations in this regard are not clearly erroneous.

■ Chris also asserts that the trial court did not give adequate consideration to the testimony of her expert witnesses. We disagree. In its memorandum decision the trial court outlined the testimony of the expert witnesses called by both parties and explained the degree of the court's reliance upon each witness and the reasons therefore. We are satisfied that the trial court gave due consideration to all relevant testimony. The trial court, who is able to listen to and observe the demeanor of the witnesses, is in a much better position than we to discover the true facts, and the appellate court is not entitled to reverse the lower court merely because it might have viewed the facts differently if it had been the initial trier of the case. *Lapp, supra,* 293 N.W.2d at 129.

■ The success of any custody resolution must ultimately rest with the parents. If they cannot set aside their differences and conflict when dealing with their roles as parents, the innocent child will most surely suffer. The following admonition by this court to the parents in *Lapp, supra,* 293 N.W.2d at 131, provides equally appropriate advice for Chris and Michael:

"The courts are unable to compel the development of healthy parent-child relationships. Nor are courts able to supervise the ongoing day-to-day happenings between parent and child. Specific conditions imposed concerning custody arrangements and visitation rights can only be justified and made workable through the combined efforts of the parents. We sincerely hope the parties in the present case recognize the importance of cooperation, and we encourage them to set aside their differences and work to provide a healthful environment for their minor child."

In accordance with this opinion the judgment of the district court is affirmed.

ERICKSTAD, C.J., and VANDE WALLE, JJ., concur.

LEVINE, Justice, dissenting.

Poor Robert! In order to "assure" that his relationship with his father "survive[s] and grow[s]," he has been placed in a state of custodial schizophrenia—six months with one parent and six months with the other. In my view, the trial court's failure to bite the bullet and award custody to one parent or the other has placed a two-year-old child in a state of animated suspension, a custodial limbo. What we have is a probationary custody period of four years, to be reviewed when Robert is of school age. Obviously, that allows the court to defer making a tough decision, but it does not justify it and we ought not approve it. By condoning a practice that may provide instant gratification to a trial judge but real problems to a very young child for whom bonding and attachments to the primary caretaker are crucial, the majority avoids the horns of the dilemma that every trial

court is faced with in a custody decision, and fails to provide any guidelines or benchmarks for trial courts to follow in resolving disputes between equally fit and loving parents over the custody of young children.

The trial court obviously disbelieved Chris' evidence of abuse by Michael. That is within the trial court's authority. However, as a consequence of the alleged abuse, a protective order had been issued restricting visitation between father and child. The trial court concluded that such restricted visitation was not in the child's best interest. But instead of removing the restraints and ordering liberal and unsupervised visitation, the trial court divided custody. To me that is wrong as a matter of law and fact. I adhere to my dissent in *Gravning v. Gravning*, 389 N.W.2d 621, 625 (N.D.1986) (Levine, J., dissenting), that divided custody should not be a tool of punishment or coercion. But even the *Gravning* holding that a custody award may be used to punish a parent for bad behavior, is inapposite to the circumstances of this case. In *Gravning* there was a unilateral parental decision to restrict visitation; in the case before us, there was a court order restricting visitation. Therefore, even under *Gravning*, the trial court erred in dividing custody.

I am alarmed by the message sent by the majority. By affirming, this court parts company with the more circumspect jurisdictions that uphold joint custody only where there is parental agreement or cooperation. *E.g. In re Marriage of Lampton*, 704 P.2d 847, 850 (Colo.1985); *Gatti and Gatti*, 73 Or.App. 581, 699 P.2d 1151, 1154 (1985); *Lembach v. Cox*, 639 P.2d 197, 200 (Utah 1981). The current issue of "Trial" features an article on joint custody that discusses a recent study of families with joint physical custody and continuing disputes. In their study, Dr. Judith Wallerstein and Susan Steinman found developmental, behavioral and emotional problems in the children and verbal and physical aggression by the parents. The study's authors caution "against encouraging or mandating joint custody or frequent access when parents are in ongoing disputes."

"Trial", April 1989, *Joint Custody* by C. Rick Chamberlin [citing 4 Barclay's California Family Law Monthly 480 (1988)].

Divided custody should be cautiously applied and approved because "shifting a child between homes forecloses a stable environment and the development of permanent associations and creates confusion regarding authority and discipline." 2 Child Custody & Visitation Law and Practice § 13.04[2]. I share the Florida court's concern and skepticism that "an infant three years old can develop normally and thrive if at the end of every six months he is removed from surroundings familiar to him and forced to become accustomed to new ones." *Hurst v. Hurst*, 158 Fla. 43, 27 So.2d 749, 750 (1946). Like the Florida court of appeals, I too would reverse a custody award that places a child alternatively with each parent for six months at a time. *Bienvenu v. Bienvenu*, 380 So.2d 1164 (Fla.Ct.App.1980). The error is exacerbated when the parents who have been awarded such joint custody are "mutually antagonistic." *Id.*

There may be circumstances in which divided custody is justified. *See Lapp v. Lapp*, 293 N.W.2d 121 (N.D.1980). However, as I stated in *Gravning v. Gravning*, 389 N.W.2d 621 (N.D.1986) (Levine, J., dissenting), when equally fit parents seek custody of young children, there should be a presumption in favor of the children's primary caretaker, the parent who provides the child with daily nurture, care and support. Professor O'Kelly describes more persuasively and effectively than I can the rationale for the presumption favoring the primary caretaker of young children and the impact of the intimate interaction between young children and their primary caretaker:

"[Primary] caregiving creates strong psychological bonding and that protection of the psychological bond ... is more important than other relevant considerations in identifying the parents in whose custody children 'will ... feel more loved or secure, or, in the long term, be more competent and effective as adults.' ..." O'Kelly, *Blessing the Tie*

*That Binds: Preference for the Primary Caretaker as Custodian,* 63 N.D. L.Rev. 482, 509 (1987).

Expert study indicates that this psychological bond is "the essential cornerstone for a child's healthy emotional development" and is "critical to the child's learning to place trust in others and to have confidence in her own capacities." *Id.* at 513.

In recommending that North Dakota recognize a preference for primary caretakers, Professor O'Kelly concludes:

"... that it would serve the best interests of young children better than unweighed considerations of all relevant factors. An explicit preference would more effectively protect children's primary psychological relationships, reduce the risk of coercive misuse of custody issues in negotiation, and facilitate trial and appellate decisionmaking...." *Id.* at 533–34.

She suggests that only if the primary caretaker is not the primary psychological parent, a truly rare occurence, should the preference be disregarded. *Id.* at 534–37. O'Kelly thus proposes a "weak" presumption in favor of the primary caretaker. *Id.*

In this case, I believe divided custody is wholly inappropriate because it removes a two-year-old child from the care of his primary caretaker for an extended duration and it requires shared parenting from parents the trial court finds unable or unwilling to cooperate. It also deprives Robert of his significant attachments to and associations with his two half-sisters.

I am not alone in my opposition. In *In re Marriage of Hickey,* 386 N.W.2d 141 (Iowa Ct.App.1986), the court reversed divided custody stating that "[i]f children were like chattels, it would seem eminently fair to divide their time as equally as possible between their parents." The appellate court awarded custody to the primary caretaker.

So too, the Minnesota court of appeals, in *Bateman v. Bateman,* 382 N.W.2d 240 (Minn.Ct.App.1986), reversed the trial court's award of divided custody, finding that it was employed to coerce cooperation between the parents, which was contrary to the children's best interest. Instead of granting joint custody because the parties could cooperate, the trial court granted joint custody because they could not. "Although ideally the parties should make major decisions concerning their children jointly, joint legal custody should not be used as a 'legal baseball bat' to coerce cooperation...." *Chapman v. Chapman,* 352 N.W.2d 437, 440–41 (Minn.Ct.App.1984).

The adverse effects suffered by children from divided custody as well as experts' continued opposition to divided custody because of the instability and discontinuity, make the concept extremely problematic. *Dodd v. Dodd,* 93 Misc.2d 641, 403 N.Y.S. 2d 401 (N.Y.Sup.Ct.1978); Goldstein, Freud, Solnit, *Beyond the Best Interests of the Child* (1973). Joint custody requires shuttling the children back and forth which undermines not only the stability of their environment but more importantly, the continuity of their care, nurture and support by the custodial parent. It also is a ready source for misuse and abuse by the parents. *Dodd, supra.*

Divided custody is a tool that should be used sparingly in exceptional circumstances. Even the majority in *Gravning* acknowledged as much. I fail to see what is so exceptional in this case to warrant divided custody. No expert recommended it and the evidence does not support it.

The cases reversing divided custody abound. *E.g. Courie v. Courie,* 288 S.C. 163, 341 S.E.2d 646 (1986) [divided custody causes confusion and interferes with proper training and discipline of the child]; *Sharpe v. Sharpe,* 256 S.C. 517, 183 S.E.2d 325 (1971) [divided custody should be avoided and is justified only in exceptional circumstances]; *Dodd v. Dodd, supra* [divided custody has adverse effect on children and parents' unwillingness to cooperate makes it inappropriate]. *See also* Annot., *Comment Note—"Split," "divided" or "alternate" Custody of Children,* 92 A.L. R.2d 695 (1963) and Later Case Service.

Notwithstanding what was said in *Gravning v. Gravning, supra,* I view divided custody as the antithesis of "Solo-

monic." I note that Solomon did not offer the contestants who appeared before him divided custody of the sought-after child and I assume he refrained from doing so for obvious reasons. It may have provided an easy out but it would have resolved neither the underlying contest of parenthood nor the source of continuing upheaval in the continuity of the child's life. Not that making a sandwich of the child is good for the child, but Solomon's acuity was in his recognition that not even combative parents would demand so much. Thus, Solomon avoided letting the parents off the hook by resorting to divided custody. Instead, he forced them into resolving the issue based upon the health and welfare (best interest?) of the child. I would require as much from the trial court.

I would reverse the award of joint custody and because the trial court found "both parents are fit custodians," young Robert's custody should be awarded to his primary caretaker, Chris Kaloupek. I therefore respectfully dissent.

MESCHKE, Justice, dissenting.

There may be rare circumstances where a child's custody "divided" from his siblings is appropriate. *Gravning v. Gravning*, 389 N.W.2d 621 (1986). There may be rare circumstances where custody alternating between parents is appropriate. *Lapp v. Lapp*, 293 N.W.2d 121 (N.D.1980).

Here, a small child was "divided" from his sisters half of each year and was "alternated" from his mother's principal care half of each year. There was no testimony, expert or otherwise, that this arrangement was in Robert's best interest. At best, this discontinuity was experimental.

In my view, "[c]ontinuity in a child's relationship with the closest, nurturing parent is ... a very important aspect of stability [for the child]. *Orke v. Olson*, 411 N.W.2d 97, 100–01 (N.D.1987)." *Roen v. Roen*, 438 N.W.2d 170 (N.D.1989). Without substantial supporting evidence, together with very specific findings, that the need and suitability of this kind of an arrangement is least detrimental for a small child, I view this alternating, divided custody as misguided. I believe that it was clearly erroneous.

Therefore, I respectfully dissent.

VANDE WALLE, Justice, concurring specially.

I concur in the result reached by the majority opinion. In *DeForest v. DeForest*, 228 N.W.2d 919 (N.D.1975), this court specifically rejected a contention that divided custody is erroneous per se. Unless a majority of this court is to reverse that decision and hold that divided custody [1] is never a permissible order of the court, I cannot conclude that the findings of the trial court are clearly erroneous.

Justice Levine is concerned about "Poor Robert"; recent literature [2] indicates society is only beginning to learn the extent of the harm to children generally as a result of divorce; hopefully the experts will also be able to learn whether divided custody

---

**1.** What constitutes "divided custody" has not been defined by this court. It is not uncommon to see custody arrangements before us in which one parent has custody of a child for the school year with the "noncustodial" parent to have "visitation" for two or three months in the summer. Although there may be disputes in these provisions, the custody arrangement has not ordinarily been defined or considered as "split" or "divided" custody which would incur the wrath, such as that of the dissenters, of those opposed to such arrangements. If three months is "divided" custody, is two months? One month? When does it become "visitation"? In the instances in which the child is of school age it is easy to consider any provision which would require the child to change homes and schools as divided custody. The definition of what is divided custody is not so easy when the child is

not of school age. In the case before us the trial court awarded joint custody alternating every six months until Robert starts school. Had the trial court awarded custody of Robert to Chris for seven months with visitation of five months to Michael, we presumably would continue to consider it as "divided" custody; but would we have done so if the "visitation" was, for example, three months?

**2.** A recent newspaper article indicates a study by Dr. Judith Wallerstein finds that recent studies reveal that the harm to children as a result of the divorce may be manifest only years later and that only now are we beginning to understand the great extent of that psychological and emotional harm.

exacerbates that harm. One might hope, perhaps piously, that "experts" and parents are as concerned about the harm to the children at the time the events in the marriage which lead to divorce occur as they are at the time the battle over legal custody rages in the courts.

We have been informed numerous times that it is for the best interest of the children to maintain a relationship with both parents. Justice Levine in her dissent cites, with apparent approval, a new study which indicates "frequent access" to children is not in their best interest when the parents are involved in "ongoing disputes." Presumably there are ongoing disputes whenever the courts are called upon to resolve the issues of child custody. Do we then conclude that it may be in the best interest of the child to terminate the parental rights of the contestant who fails to win custody?

Nor is it a satisfactory answer to conclude that only when the parents agree and cooperate should divided custody be ordained by the courts. If the parents agree to custody and there is no reason to believe the children are deprived as a result of that agreement,[3] there is no place for intervention by the courts. Section 14–05–22(1), N.D.C.C., recognizes this: "In an action for divorce, the court, before or after judgment, *may give such direction for the custody, care, and education of the children of the marriage as may seem necessary or proper, ...*" [Emphasis added.] Therefore, if, as the dissents appear to suggest, we are to approve divided custody only when the parents agree, we should reverse *DeForest* and hold divided custody is erroneous per se when ordered by the

court and is permissible only when the parents agree to cooperate and do not need the courts to settle the issue of custody. We would do the children, the parents, and the trial courts a disservice to continue to give lip service to divided custody as a possible disposition in a contested custody case, but to criticize and reverse the trial court when it concludes divided custody is in the best interest of certain children when that conclusion is based on findings which cannot be said to be clearly erroneous. If the result is foreordained, regardless of the facts, let us say it. I cannot conclude that the trial court's decision in this case was clearly erroneous.

---

**3.** Although Chris alleged Michael was guilty of sexual abuse of a daughter of Chris, and succeeded in obtaining a court order restricting visitation with Robert as a result of that allegation, it is apparent from the trial judge's written decision that he considered the allegation to be a ruse on Chris's part in order to limit contact between Robert and Michael. I might agree with Justice Levine's contention that divided custody should not be a tool of punishment or coercion, but neither should a party who obtains, under false pretenses, a court order limiting visitation with the other parent be rewarded for such actions. Assuming, as the authorities

have suggested, that a relationship with both parents is in the best interest of the child, there is a point where the attempt by one parent to thwart that relationship is contrary to the child's best interest. In that instance it is unjustifiably inflammatory to continue to contend that divided custody is primarily used to punish a parent for bad behavior rather than, in the child's best interest, to foster a relationship with the other parent. If thwarting the intention of the offending parent in order that the child might have a relationship with the other parent is "punishment," so be it.