Rhonda BERG, Plaintiff, Appellee and Cross–Appellant,

v.

Richard BERG, Defendant, Appellant and Cross–Appellee.

Civ. No. 920016.

Supreme Court of North Dakota.

Oct. 13, 1992.

---

Pringle & Herigstad, PC., Minot, for plaintiff, appellee and cross-appellant; argued by Carol K. Larson.

Ella Van Berkom Law Firm, Minot, for defendant, appellant and cross-appellee; argued by Ella Van Berkom.

ERICKSTAD, Chief Justice.

In this divorce case, Richard Berg appealed from the trial court's custody decision and property division. Rhonda Berg cross-appealed, alleging error by the court in its award of visitation for Richard and its division of the grain from the 1989 crop. We affirm.

Richard and Rhonda were married in December 1981. They have two children of the marriage: Matthew, born September 15, 1982; and Elizabeth, born March 11, 1985. During the marriage the family resided on a farm near Max. Richard rented land and farmed with his father. During the winter months Richard worked as a welder. Rhonda attended college at Minot State University during the marriage. She received a bachelor of arts degree in elementary education, and at the time of trial was completing work on two masters degrees, one in elementary education and the other in learning disabilities. Over the years, the marriage relationship between Richard and Rhonda deteriorated. Several months after Rhonda attended a seminar in Wisconsin, where she met John Nugent, an elementary school principal from Michigan, Rhonda announced that she wanted to dissolve her marriage with Richard. Rhonda and the children moved from their home at Max during December 1989.

On August 1, 1991, the trial court entered an interlocutory decree, granting Richard and Rhonda a divorce from each

other on the grounds of irreconcilable differences, but reserving the other issues, including custody and property division, for resolution at a later time. During the pendency of these divorce proceedings, Rhonda informed the court that she intended to marry Nugent and that she wanted to move with the children to reside with him in Michigan. Following a four-day hearing, the trial court, on January 14, 1992, entered a final amended judgment, settling the custody, property division, and other issues in the case.

The court awarded custody of Matthew and Elizabeth to Rhonda and awarded Richard visitation of "at least 77 consecutive days" during each summer. Richard was also awarded the right to 48–hour weekend visits, upon giving Rhonda proper notice. Rhonda was awarded "reasonable visitation" with the children during the summer. The court also specified that each parent would have alternating Christmas vacations with the children.

Richard appealed the custody award, asserting that the trial court should have awarded custody to him, with reasonable summer visitation for Rhonda. Rhonda cross-appealed from the custody award, asserting that Richard's summer visitation of 77 consecutive days was too much and that she should have been given additional time to be with the children during the summer months.

 A trial court's determinations on matters of child custody are findings of fact that will not be set aside on appeal unless they are clearly erroneous. Rule 52(a), N.D.R.Civ.P.; *Bashus v. Bashus*, 393 N.W.2d 748 (N.D.1986). A finding of fact is clearly erroneous only when the reviewing court is left with a definite and firm conviction that a mistake has been made. *Lapp v. Lapp*, 293 N.W.2d 121 (N.D.1980). In determining custody, the trial court must consider and evaluate the factors affecting the best interests and welfare of the children, as enumerated under Section 14–09–06.2, N.D.C.C., but the trial court is not required to make separate findings on each relevant statutory factor. *Wolf v. Wolf*, 474 N.W.2d 257 (N.D.1991). The tri-

al court's findings of fact are sufficient if they afford this court a clear understanding of the factual basis for the trial court's determination. *Healy v. Healy*, 397 N.W.2d 71 (N.D.1986).

The trial court concluded that it would be in Matthew and Elizabeth's best interests to be in Rhonda's custody during the school year and to live with her and their stepfather in Michigan. The court also concluded that it would be in the children's best interests to have extended visitation with Richard during the summer months. The trial court made numerous specific findings explaining the reasons for its custody decision. We quote the most edifying of those findings here:

"The Court specifically examined the factors required by N.D.C.C. 14–09–06.2 to be considered in determining the best interests and welfare of the children and finds that:

"a. Both Rhonda and Richard love their children a great deal and likewise the children are strongly attached to their parents.

"b. Both parents have the capacity and disposition to give the children love, affection and guidance and to continue their education. Rhonda has a sincere interest in education and higher education as evidenced by her Bachelors Degree in Elementary Education, and her progress towards completion of two Masters degrees, one in elementary education and one in learning disabilities. Prior to the parties' separation, Rhonda had primary responsibility for the children['s] education, such as attending parent[/]teacher conferences, etc. After the parties separated, Richard began to attend these conferences.

"c. Both partners are disposed to providing the children with food, clothing and medical care.

"d. The children have lived with Rhonda as the primary caretaker since the parties' separation in December of 1989.

\* \* \* \* \* \*

"g. Rhonda is in good physical and mental health. Richard, on the other

hand, has suffered depression since the parties' separation. He received psychological therapy from Dr. Timothy Eaton, has taken parenting classes from a social worker and has been hospitalized for a hernia operation and was hospitalized for an uncontrollable nose bleed. After a year of therapy with Dr. Eaton, Richard was evaluated by Dr. Podrygula. Psychological evidence presented in Court suggests significant personal difficulties on the part of the Defendant.

"h. * * * * *

"When Rhonda and Richard separated, the children were attending St. Nicholas School in Garrison, where Rhonda was the principal. After Richard's family contacted the school board concerning their belief that Rhonda left Richard for another man, Rhonda was fired from her position. After losing her job, Rhonda was forced to move to Minot, where she elected to continue her education to increase[ ] her employment opportunities in the future. The children have adjusted to the new school system very well and are well equipped to adjust to a new school in the future. Custody awarded to either parent will necessitate a move to a new school.

 * * * * * *

"j. * * * * *

"The parties could not agree about Rhonda's desire for higher education and a career outside of the home. Richard disapproved of Rhonda's choice of reading material. He preferred she only read women's or family magazines. In 1985, Rhonda requested marital counseling. Richard refused to participate.

 * * * * * *

"1. It was the clear and unequivocal recommendation of Dr. Podrygula that Rhonda be awarded full custody of the children and that Richard be given visitation."

Richard argues that neither Dr. Podrygula nor the trial court gave adequate consideration to the permanence and stability of the children's home at Max, or of the extended family there, including both sets of grandparents with whom the children have developed a strong loving relationship. We disagree that these important factors were not given adequate consideration.

Dr. Podrygula stated in the conclusory remarks of his report that both Richard and Rhonda "are clearly capable of effective parenting behavior." He stated that Richard "probably could give [the children] more continuity with, and access to, the past" but that Rhonda "could likely better prepare them for the future, by exposing them to new people and experiences." The court expressly found that Rhonda was forced to move with the children to Minot to enhance Rhonda's future employment opportunities, after she was fired from her position as principal of the St. Nicholas School in Garrison, because of information Richard and his family gave to the school board about Richard and Rhonda's marital problems. The court also found that the children had been able to adjust very well to the new school system and that, under the circumstances, whichever parent received custody of the children would almost certainly move them to a new school.

The trial court faced the dilemma of balancing the advantages of having the children reside with Richard on the farm at Max, near their extended family, with the positive attributes that residing with Rhonda would offer the children. In that regard, the court agreed with the following statements made by Dr. Podrygula:

 " [Rhonda's] emotional functioning seems a bit more health[y] than Richards; her personality traits and career would probably result in the children being exposed to a lot more new things (and better prepared for independent life, as adults); her very strong education background would give her a lot more technical expertise in raising children and letting them achieve their full potential; and she has demonstrated more effective parenting, at least within the confines of the evaluation process.'

 * * * * * *

 " 'I am concerned about Richard's maladaptive personality traits and difficulty

in controlling his behavior. While he might do a better job inculcating some abstract moral code, I don't think he would do as good a job in preparing his children for a confusing and rapidly changing world, in which people often do not act like we would want them to act.'"

Richard complains that the trial court did not give enough weight to the recommendations of Dr. Timothy Eaton, a licensed clinical psychologist in Minot, or of Don Schneider, a regional supervisor for the State Department of Human Services. Dr. Eaton treated Richard for "situational depression and anxiety" and concluded in a memorandum that, "there is no psychological evidence in my work with [Richard] that would otherwise suggest he should not be considered for as much contact, including custodial rights, with his children as the court would allow." Mr. Schneider evaluated Richard on numerous occasions. He filed a report recommending that Richard receive custody of the children. While Dr. Podrygula conducted an extensive study and evaluation of all family members, including Richard and Rhonda, neither Dr. Eaton nor Schneider contacted Rhonda or attempted to assess and evaluate her fitness for receiving custody of the children. That was certainly an important factor for the trial court to consider in weighing these expert opinions.

The trial court is vested with substantial discretion in determining what custody arrangements are in the best interests of the children, and we will not reverse a decision of the trial court simply because we may have viewed the evidence and weighed the factors differently had we been the trier of fact. *See, e.g., Kitzmann v. Kitzmann,* 459 N.W.2d 789 (N.D.1990). The trial court clearly recognized that both Richard and Rhonda are loving, affectionate, capable parents who are fit to have custody of their children. The paradox in a situation like this was aptly summed up by Justice Meschke in *Landsberger v. Landsberger,* 364 N.W.2d 918 (N.D.1985):

"When parents disagree on how to complete their responsibilities for raising their children, our courts must choose for them and, often, between them. Unfortunately, thousands of years of experience since Solomon's famous decision have not given judges any better way to determine what is best for the children, particularly when choosing between two loving and fit parents."

We are satisfied that the trial court properly weighed all of the relevant statutory factors for determining what custody resolution would be in Matthew and Elizabeth's best interests. We are not left with a definite and firm conviction that the trial court made a mistake in awarding custody of the children to Rhonda, with extensive summer visitation for Richard. The judgment wisely provides that Richard's summer visitation must not "conflict with any education of the children during the traditional school year." It also gives Rhonda "reasonable visitation" with the children during the summer, providing that she gives Richard one week's prior written notice.

Rhonda objects that Richard was awarded the right to make 30–minute weekly telephone calls to each child, while the children are in Rhonda's custody, but that she was not given a reciprocal right to make telephone calls. Although the trial court did not expressly award Rhonda the right to make telephone calls to the children when they are in Richard's custody, nothing in the judgment prohibits her from doing so. If she desires to maintain contact with the children during the summer in this way and if she feels that Richard is unreasonably prohibiting her from doing so, Rhonda can request the court to exercise its continuing jurisdiction to correct the situation.

In dividing the marital property, the trial court awarded Rhonda one-half of the grain for the 1989 and 1990 crops. Richard asserts that it was clearly erroneous for the trial court to award Rhonda any part of the 1990 crop, because Rhonda left the farm at Max in December 1989, and made no contribution to the farming operation in 1990.

In dividing marital property, the trial court must make an equitable distribution of the assets. *Bader v. Bader*, 448 N.W.2d 187 (N.D.1989). The trial court's division of property is treated as a finding of fact that will not be set aside on appeal unless it is clearly erroneous. *Dick v. Dick*, 414 N.W.2d 288 (N.D.1987). Richard and Rhonda resided together in marriage for about eight years. During this time they did not acquire any farmland, machinery, or equipment. At the time of the divorce, the grain from the 1989 and 1990 crops was the only marital asset with substantial value. The trial court divided Richard and Rhonda's personal possessions equitably between them, in a manner that was apparently acceptable to both. The court then divided the grain equally between them. Although Rhonda may not have directly contributed toward the production of the 1990 crop, she was trying at that time to maintain full-time employment and, in that way, to assist in providing for herself and the children. Under the circumstances, we are not convinced that the trial court's equal division of the 1990 grain was a mistake or that it resulted in a clearly erroneous division of the marital property.

On her cross-appeal, Rhonda asserts that the judgment contains a clerical error regarding the 1989 crop. She claims that the judgment inadvertently lists the 1989 grain in dollar terms with numbers that actually represent the number of bushels, not dollar amounts. Richard's counsel would not concede on appeal that this was a clerical error. It does appear, however, that the numbers in the judgment correspond to the "bushels" of grain from the 1989 crop, in accord with Richard's testimony.

Pursuant to Rule 60(a), N.D.R.Civ.P., the trial court can correct a clerical mistake at any time, either on its own initiative or on the motion of a party. The trial court is in a better position than we are to know if there has been a clerical error in the judgment. Nothing in this opinion should be construed to prohibit Rhonda from seeking relief under Rule 60(a), N.D.R.Civ.P., subject however to the views we expressed in *Judicial Conduct Commission v. Wilson*, 461 N.W.2d 105 (N.D.1990).

AFFIRMED.

JOHNSON, J., concurs.

LEVINE, J., concurs in the result.

JAMES A. WRIGHT, District Judge, sitting in place of MESCHKE, J., disqualified.

VANDE WALLE, Justice, concurring in result.

In 1976, Justice Paul Sand, writing for the Court in *Bjerke v. D.T.*, 248 N.W.2d 808, 814 (N.D.1976), observed that we are "sensitive to the argument that it is dangerous to allow the judgment of social workers to determine how a family is run ... this is especially true in situations where emotional or psychological harm is alleged, because of our relatively limited knowledge of child development and the nature and causes of psychological harm." Similar comments have appeared in subsequent cases, *see, e.g., McBeth v. J.J.H.*, 343 N.W.2d 355 (N.D.1984); *In Interest of J.K.S.*, 274 N.W.2d 244 (N.D.1979). This is 1992 and this case involves an issue between parents of custody of children and the opinion of a clinical psychologist rather than a social worker. Nevertheless, I believe the same rationale applies: that judges cannot surrender to professional psychologists the judges' responsibility to decide the issue of the best interests of the children.

Richard argues that the trial judge ignored Richard's expert witness, also a clinical psychologist, and relied solely on the independent expert witness. Richard further argues that the independent expert was overly impressed with Rhonda's educational background. Indeed, the trial judge in his decision quoted with approval excerpts from that expert's testimony to the effect that while Richard "might do a better job inculcating some abstract moral code, I don't think he would do as good a job in preparing his children for a confusing and rapidly changing world...." That statement involves a "judgment" that moral codes are "abstract" and that prepara-

tion for a "confusing and rapidly changing world" is more significant than a moral code, even an abstract one. There are those who would disagree and others who would suggest the two are not and should not be mutually exclusive. Such a conclusion, if it is to be used as the basis for awarding custody, is more properly the domain of the trial judge, considering all factors, than one for the expert clinical psychologist.

Fortunately for Rhonda, that statement does not appear to be the sole or even primary basis for the expert's recommendation or the trial court decision. The majority opinion outlines the other matters considered by the trial court. The trial judge was obviously impressed by the thoroughness of the independent expert witness and influenced by his recommendation, but I do not believe the trial judge surrendered the decision-making process to the expert. If I did so believe I would vote to reverse. Rather, I believe the trial judge, although admittedly influenced by the recommendation of the independent witness, exercised a neutral judicial discretion to reach the decision in this case. That decision is not clearly erroneous under our interpretation of Rule 52(a), NDRCivP, and I therefore concur in the result.

JAMES A. WRIGHT, District Judge, dissenting.

In reviewing a decision rendered by the trial court, Rule 52(a), N.D.R.Civ.P., mandates that "due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses," and that a trial court's finding of fact "shall not be set aside unless clearly erroneous." A finding of fact is not clearly erroneous unless it has no support in the evidence or, although there may be some supporting evidence for it, this court is left with the definite and firm conviction that a mistake has been made. *Landsberger v. Landsberger*, 364 N.W.2d 918 (N.D.1985). In this case, although there may be some evidence supporting an award of custody to Rhonda, I am left with the firm conviction that a mistake was made when the trial court did not award custody to Richard.

In Section 14–09–06.2, N.D.C.C., the North Dakota Legislature has set forth certain factors that the court is to consider when deciding which of the parents is to receive custody in a contested custody matter. This court has stressed the importance of those factors in many of its decisions. In *Gravning v. Gravning*, 389 N.W.2d 621 (N.D.1986) this court indicated that the guiding standard is " 'the best interests and welfare of the child,' Section 14–09–06.1, N.D.C.C., which must be determined by the court's consideration and evaluation of all factors affecting the best " 'interests and welfare of the child' as enumerated in Section 14–09–06.2, N.D.C.C." The trial court is vested with substantial discretion in matters of custody and in the determination of what is in the best interests of the child, but it must consider and evaluate all factors that affect those best interests and welfare as enumerated in Section 14–09–06.2, N.D.C.C., although it is not required to make separate findings on each relevant statutory factor. *Wolf v. Wolf,* 474 N.W.2d 257 (N.D.1991). The trial court is to weigh each factor as it deems fit and there is no requirement that it assign one factor priority or give one factor more weight than another. *Blotske v. Leidholm,* 487 N.W.2d 607 (N.D.1992).

In this case, the trial court made findings on all of the factors set forth in Section 14–09–06.2, N.D.C.C., except factor (i) which deals with the preference of a child. The trial court found that some of the factors were a draw and did not favor either of the parties however, it did find that some of the factors favored Rhonda. It is unclear if the trial court determined that any of the factors favored Richard.

In failing to do that I feel that some of the findings of fact made by the trial court were clearly erroneous. For example, under factor (f), which deals with moral fitness of the parents, the court stated the following:

"Richard attempted to portray the marital difficulties between the parties as resulting from Rhonda's involvement with John Nugent."

I don't believe that this is a finding of fact and it is certainly unclear whether or not the court made a determination that Rhonda's involvement with John Nugent led to the marital difficulties. If the trial court did not consider the moral fitness of Rhonda a factor that favored Richard it should have. The evidence seems to be clear that in the fall of 1989 Rhonda went to a seminar in Wisconsin where she met John Nugent, who was a married elementary principal from the State of Michigan. Shortly after Rhonda and Mr. Nugent returned to their respective homes, they announced to their spouses that they wanted divorces and as Rhonda obtained a divorce in North Dakota, John Nugent obtained a divorce in Michigan. Rhonda has since married John Nugent and moved to Michigan with the parties' children.

The court's findings of fact on factor (d) did not go far enough. As to factor (d), which relates to the length of time a child has lived in a stable, satisfactory environment and the desirability of maintaining continuity, the court found that the children have lived with Rhonda as the primary caretaker since the parties' separation in December of 1989. It should be remembered that these children were with Rhonda as a result of an interim order entered by the trial court in December of 1989. The court should have given some consideration to the parties' family home near Max, North Dakota, where the oldest child has resided most of his life and the youngest child has resided all of her life. Further, the trial court gave no consideration to the "extended family" of both Rhonda and Richard. Both Rhonda and Richard have family members, including their parents, living in or near the Max area. As the children have been growing up, these family members have had extensive contact with the children. With the children now moving to the State of Michigan to reside with Rhonda and her new husband, the contact between the extended family members and the children will be limited. This contact is important and it is something that the trial court should have considered. *Lapp v. Lapp*, 293 N.W.2d 121 (N.D.1980). In *Bashus v. Bashus*, 393 N.W.2d 748 (N.D.1986), this court noted the following about contact with extended family members:

"We determined that the grandparents' involvement was an appropriate factor in support of the trial court's decision to award Trina's parents joint custody. We concluded that children 'need interaction and interrelationship with their parents, siblings, and other persons who may significantly affect the child's best interests.'"

This court has made it clear that the trial court is to evaluate all factors that affect the best interests and welfare of a child. *Wolf*, supra. The trial court did not adequately evaluate factor (d) when it failed to consider the children's home in Max or the "extended family."

Under factor (k), the trial court is also to make some redetermination concerning the interaction of interrelationship of any person who resides in or frequents the household of a parent and who may significantly affect the child's best interests. A determination under this factor is not limited to a person who has a history of causing physical injury. As has already been pointed out, the trial court made no determination concerning the interaction or interrelationship of the extended family with these children and it made no determination on what effect John Nugent, who is now married to Rhonda and living with her and the children, would have on the children. John Nugent's ex wife, Linda Nugent, testified at this trial and her testimony about his relationship with the children from their marriage, a boy 19 and twin daughters 17, was hardly glowing. She testified that at the present time his relationship with his children is nonexistent and during the time that they were growing up he was never very close to his children nor did he have much time for them. John Nugent's ex wife testified that he was not a violent person but when he became frustrated with the children he would take out his frustration on some object such as a wall or a window or a door. Her testimony very clearly indicated that he did not enjoy children. This appraisal was from a woman

who had lived with John Nugent for 20 years and raised three children with him. The trial court should have made some determination as to how John Nugent's relationship with the children was going to affect them.

Lastly, the trial court appears to have relied almost exclusively upon the recommendation of Dr. Podrygula in making its custody decision. Under factor (*l*), which allows the court to consider anything else that is relevant, the trial court set forth that it was Dr. Podrygula's clear and unequivocal recommendation that Rhonda be awarded full custody. In its memorandum opinion, the court indicated that it had considered all of the factors set forth in Section 14–09–06.2, N.D.C.C., but added that one of the key factors in the court's determination was the psychological evaluation by Dr. Podrygula.

In Justice VandeWalle's concurrence, he indicated that judges cannot surrender to professional psychologists the judge's responsibility to decide the issue of the best interest of the children. I am in agreement with that and based upon the record in this case that appears to have been what happened.

While the psychological evaluation may have been thorough and helpful, as indicated by the trial court, it appears to be an evaluation that was influenced by Rhonda's education and Dr. Podrygula's feeling that growing up in rural North Dakota does not offer much challenge or opportunity to children.

While Rhonda's educational qualifications are certainly impressive, it should be remembered that the trial court found that both parents have the capacity and disposition to give the children love, affection and guidance and to continue their education. While Rhonda's education worked to her advantage in this case, it should be remembered that there are a number of spouses who have not pursued their education but instead have stayed in the home raising the children or, while raising the children, worked at low paying jobs putting their spouses through school. Does this mean that they are less qualified to have custody? It makes one wonder if the roles would have been reversed in this case, would Richard have been allowed to take the children to Michigan to a new job and a new wife?

Also, Dr. Podrygula seemed to have a disdain for rural North Dakota. In his report he indicated as follows:

> "Growing up in Max would offer a lot of stability, but probably not too much challenge or opportunity."

Given the fact that North Dakota is a rural state that stresses its quality of life, this is particularly disturbing. I'm sure we would not have to look very far to find children that have come out of towns as small as Max or smaller who have been successful as adults. Also, heaven forbid, what if these children wanted to be farmers like their father?

For the reasons set forth above I respectfully dissent.